UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SARAH MARIE JOHNSON, | |
| Petitioner, | Case No. 4:14-cv-00395-CWD |
| vs. | **MEMORANDUM DECISION AND ORDER ON ALL PENDING MOTIONS** |
| AMANDA GENTRY, | |
| Respondent. | |

Petitioner Sarah Johnson (Sarah) is proceeding on her Amended Petition for Writ of Habeas Corpus. (Dkts. 8, 8-1.) Pending before the Court is Respondent Amanda Gentry's Motion for Partial Summary Dismissal and Sarah's Motion for Limited Discovery. (Dkts. 16, 20, 19.) In addition, Attorney Dennis Benjamin and Deborah Whipple, pro bono counsel, have appeared on behalf of Sarah to seek appointment of counsel to aid her in discovery. Other procedural motions are also pending.

Having reviewed the record and considered the argument of the parties, the Court enters the following Order.

# SUMMARY OF DECISION

At age 16 (while still a minor child under the laws of Idaho), Sarah was convicted of shooting her parents to death in a criminal case in Blaine County, Idaho. The state district court sentenced Sarah to two fixed life sentences without the possibility of parole, as well as a statutory firearm enhancement of 15 years. Sarah is now 32 years old and has completed the firearm enhancement sentence, having served 16 years in prison in the custody of the Idaho Department of Correction (IDOC).

In recent years, the United States Supreme Court has sent a strong message to state and federal district courts to carefully scrutinize cases involving youthful offenders serving harsh sentences. *See Miller v. Alabama,* 132 S.Ct. 2455 (2012) (mandatory life without parole for juvenile homicide offenders violates the Eighth Amendment's prohibition on cruel and unusual punishments); *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016) (*Miller* holding is retroactive and binding on the states). This Court has, and will continue to, review Sarah's case with an added measure of scrutiny in accordance with this charge from the United States Supreme Court.

After a long and detailed review of the state court record and consideration of the parties' arguments, the Court is convinced that Sarah shot her parents. The Court will not permit discovery because no "miscarriage of justice" will occur in keeping Sarah imprisoned for her crimes because she is not actually innocent. However, because this

case warrants extra scrutiny, the Court will appoint Dennis Benjamin prospectively as counsel for Sarah at public expense to aid in briefing of the remaining claims.

The Court will conditionally grant Respondent's Motion for Partial Summary Dismissal on Claims One, Three, Four, Five, and Six on procedural default grounds, and alternatively deny Claims One and Six on their obvious lack of merit. The Court will consider the merits of the remaining procedurally defaulted claims—Three, Four, and Five—after briefing by the parties.

## BACKGROUND

Alan Johnson (Alan) and Diane Johnson (Diane) were shot to death in their Bellevue, Idaho home between 6:20 and 7:00 a.m. on Tuesday, September 2, 2003. (State's Lodgings A-16, H-8.) Sixteen-year-old Sarah and her parents were the only ones home. (*Id.*) Sarah's older brother, Matthew Johnson (Matthew), was away at college at the University of Idaho, about a day's journey from home, when his fiancée called him and said his parents had been shot. (State's Lodging A-19, pp. 4540-41.)

Alan and Diane's bedroom door was found propped open with two pillows. (State's Lodging A-15, p. 2022.) They often did that during hot months because, otherwise "the wind would create a suction in the house, or a vacuum, and slam the doors." (State's Lodging A-19, p. 4547.) To help the air circulation, they would also leave the sliding glass doors in their bedroom and downstairs off the living room open at night. (*Id.*, p. 4548.)

Diane was found lying face-up in her bed with a comforter covering her body and tucked around her head. (State's Lodgings A-15, pp. 1794-95; A-20, pp. 5220-24.) She had been killed instantly in her sleep by one point-blank shot to the head with a .264 caliber high-power rifle. (State's Lodging A-16, pp. 2310-17.) With the bullet traveling about 3600 feet per second, the single shot shattered her skull and brain. (*Id*. p. 2311.) When investigating officers lifted the comforter, Diane's head was missing from her chin up. (State's Lodging A-15, p. 1795.) Blood, skin, hair, brain tissue, and bone fragments spattered across the ceiling and walls, into the hallway, and onto the wall of Sarah's bedroom directly across the hall. (State's Lodgings A-15, A-16.) From the spatter pattern, Detective Stuart Robinson (Detective Robinson) testified that the shooter had stood on the east side of the bedroom, because the blood "basically [went] straight up, and it [came] out to the west." (*Id*., p. 2024.) Expert Rod Engle agreed that "the event occurred at the east side of the room, projecting all the blood … towards the west and somewhat towards the north." (State's Lodging A-18, p. 4141.)

Alan was shot as he emerged from the shower. The shot went through his left lung. Forensic pathologist Dr. Glen Groben opined that Alan bled to death from that wound over the course of several minutes. (State's Lodging A-16, p. 2304.) From the blood pattern on the floor, experts determined that Alan had managed to walk over to Diane's bedside before he collapsed and died. (*Id*., pp. 2320-21; State's Lodging A-18,

pp. 4145-49.) Alan was found lying face down between the nightstand and bed. (State's Lodging A-15, p. 1662.)

Many of the neighbors heard the shots that early Tuesday morning. (State's Lodgings A-15, p. 1520; A-16, generally.) Several neighbors testified that two shots were fired within a few minutes, with the second shot being louder than the first (State's Lodging A-16, pp. 2630, 2636.) Shortly after the shots, neighbors heard a female—later identified as Sarah—outside screaming that "someone had shot her dad" and "someone had shot her parents." (State's Lodgings A-15, p. 1518; A-16, p. 2631.) Sarah sought refuge at a neighbor's house. People who came to help and comfort Sarah puzzled over why her hair was neatly fixed and her casual clothing did not look as though it had been slept upon. (State's Lodgings A-15, pp. 1522-23, 1545-47, 1559-60, 1578-79; A-16, pp. 2520-21.)

As police investigators arrived at the scene that early morning, they realized it was trash day, and pulled the Johnsons' two trash cans back from the curb. One was filled with yard debris. The other contained Sarah's pink bathrobe, covered in blood spatter, wrapped around a left-hand women's leather glove and a latex glove. (State's Lodging A-15, pp. 1893-95.)

The left-hand leather glove had no blood on it. Some experts believe it may not have been worn during the shooting because of the lack of blood spatter. However, the glove tested positive for gunshot residue. (State's Lodgings A-20, pp. 5289, 5290; A-18,

pp. 3592-96.) The latex glove was so old it was discolored. (State's Lodging A-17, p. 3110.)

Matthew identified the leather glove as being from the set Diane kept in her car in the garage—Diane and Sarah had worn them at football games, and Diane sometimes wore them when driving. The Johnsons owned multiple first aid kits containing latex gloves, including in Diane's car, Alan's truck, the garage, Alan's bathroom, and Matthew's bathroom. (State's Lodging A-19, pp. 4572-75.) When tested, the latex glove found in the garbage can had Sarah's DNA and an unknown person's DNA on the inside of it, but had no blood on the outside of it. Like the left-hand leather glove, the latex glove also had gunshot residue on it.

The guest house located over the Johnsons' garage occupies a prominent place in the story. About a year earlier, Alan and Diane had rented the guest house to Alan's friend, Mel Speegle (Mel), who usually spent Monday through Friday there for a local construction job, and the weekends in Boise, where he and his wife owned a house. On Labor Day weekend just before the shootings, Mel decided to spend the holiday with his wife in Boise, rather than return to the guest house. (State's Lodging A-16, pp. 2686-94.)

Before moving into the guest house, Mel had inherited several guns when his father passed away, and Mel had kept them at a ranch. Mel's friend, Christopher Hill (Christopher) was the ranch caretaker. Mel eventually sold the ranch, and Christopher helped Mel move into the guest house. There, Mel stored the unlocked guns in his closet

under some clothes. Mel kept the door to the guest house locked when he was away. (State's Lodging A-16, pp. 2692, 2702-09.)

Sarah knew Mel was gone that long weekend, and she had a key to the guest house. The key was found on a small table in Sarah's bedroom on the day of the murders. (State's Lodging A-15, p. 2037.) Sarah was familiar with Mel's place, had cleaned it for him on earlier occasions, and had also entertained her friends there from time to time. (State's Lodging A-16, p. 2689.)

The Labor Day weekend brought Diane's sister, Linda Vavold, for a visit to the Johnsons' house. Linda observed that Sarah had spent time in the guest house. Sarah had said she was studying. School had started only four days earlier. Linda testified that when she saw Sarah go to the guest house, Sarah was not carrying books or a backpack. (State's Lodging A-17, pp. 3335-56.)

On the day of the shootings, investigators found four different types of ammunition and three guns at the Johnsons' property. Included in the collection of inherited guns kept unlocked in Mel's closet was the .264 caliber high-power rifle used to kill Alan and Diane, along with a box of .264 bullets. That gun was found in Alan and Diane's bedroom. Two unused .264 bullets were found in Sarah's room on a nightstand. (State's Lodging A-15, pp. 2039-40.) A spent .264 shell casing was found in the garage. (*Id.*, pp. 2051-53.)

Mel also kept an unlocked .22 caliber bolt-action long rifle in his guest house closet. During investigation of the shootings, Officer Raul Ornelas found Mel's .22 rifle on a chest freezer in the garage. (State's Lodging A-15, pp. 1729-31.) It was not used in the shootings.

Investigators also found a box of Remington .25 caliber bullets with five missing bullets on an upright freezer in the garage. Five .25 bullets were found in the pink robe's pocket. (State's Lodging A-15, 1900.). While .22 and .25 bullets look somewhat similar, they are not interchangeable, and the .25 rounds in the robe pocket, taken from the box of .25 ammunition found in the garage, would *not* have fit into the .22 rifle left on the freezer. (State's Lodging A-15, p. 2050). Investigators theorized that the unanticipated mismatch was the reason the shooter left the .22 rifle unused in the garage and the .25 bullets in the robe pocket and opted for the .264 rifle.

Alan owned a 9 millimeter handgun, which was found locked in a gun safe in the garage under the guest house. (State's Lodging A-15, pp. 2061.) A handgun magazine containing six unused 9 millimeter bullets was found wrapped in a red bandana on the bottom shelf of a nightstand in Sarah's bedroom. (*Id*., pp. 2038-2040.) The 9 millimeter magazine found in Sarah's room appeared to fit the 9 millimeter handgun in the safe. (*Id*., p. 2062.) The weekend before the shootings, Linda heard Sarah ask Diane for the key to the gun safe. (State's Lodging A-17, p. 3336.) Diane had told Sarah to ask her dad. (*Id*.,

p. 3336.) Investigators also theorized that the 9 millimeter handgun was the shooter's original weapon of choice, but it simply was unavailable at the time of the shootings.

Mitch Marcroft, who was the secretary of the Blaine County Gun Club from 2001 to 2004, testified that Alan and Diane were members of the gun club, made up of trap shooting enthusiasts. Mitch first saw Sarah at the gun club when she was about 13; she came with her father quite often. Mitch had not observed Sarah shooting rifles, but he observed her shooting a shotgun at the Miller Fun Shoot in 2002. (State's Lodging A-18, pp. 3664-3666.)

Sarah was right-handed, but on the day of the shootings, medical investigators examined her and found several parallel linear bruise marks on her left shoulder that could have been made from a rifle recoil. (State's Lodging A-16, pp. 2248-49.) Another person later testified at the post-conviction hearing that the .264 gun "kicked really hard." (State's Lodging E-9, p. 967.) Sarah explained the bruises away by saying that she had fallen and hit her shoulder on a table on Friday before the Tuesday shootings. (State's Lodging A-16, p. 2444.)

Quite a bit of additional evidence was found at the scene of the crime. The robe had dried paint residue on the inside of it; the T-shirt Sarah wore on the morning of the murders had matching dried paint residue. (State's Lodging A-18, pp. 3602-3610.) The robe also had gunshot residue on it. (State's Lodging A-17, pp. 3231-38.)

A woman's right-hand leather glove that matched the left one found in the garbage can was sitting on a table in Sarah's room along the west wall. This glove had gunshot residue and Sarah's DNA on it, but it did not have the victims' blood on it. (State's Lodgings A-15, pp. 2034-2036; A-17, p. 3240.)

Diane's blood and brain matter were found in Sarah's room. A piece of metal bullet shaving and body tissue were removed from the door jamb of Sarah's bedroom door. All of this indicated that Sarah's bedroom door and her parents' bedroom door were open when the shots were fired. (State's Lodging A-15, pp. 2043-44.)

Two kitchen butcher knives were found on the floor at the foot of Diane's bed, and one knife was found at the foot of the guest room bed, where Matthew stayed when he was home from college. Investigators determined that the knives were not instruments of the crime. (*Id.*, pp. 2411-2414.) All of the knives came from the Johnsons' kitchen. (*Id.*, p. 2414.)

Investigators were baffled by the placement of the knives in the bedrooms. Sarah suggested to Sheriff Jerry Femling (Sheriff Femling) that the knives could be a gang sign that she or her brother were "marked." (State's Lodging A-16, p. 2450.) Detective Robinson then investigated whether the knives were gang-related. Robinson spoke to a Boise gang unit detective and a Salt Lake City detective, and neither had ever heard of anything similar regarding how and where the knives were placed at the scene of the crime. (*Id.*, pp. 2120-21.)

Officer Raul Ornelas saw two or three sets of human footprints in the matted grass in the backyard going northeast from the house to the back of the guest house. (State's Lodging A-15, p. 1736.) Investigators noted that the path Sarah took to get to her neighbors' house went right by the trash cans. (State's Lodging E-7, p. 284.)

A key figure in this story is Sarah's boyfriend, Bruno Santos (Bruno), a 19-year-old undocumented Mexican immigrant and high school dropout. They had been dating for about three months at the time of the murders. Bruno and Sarah had engaged in sexual intercourse and had exchanged "promise" rings. (State's Lodging A-16, p. 2440.) Sarah told several people that she and Bruno were engaged to be married, but she told investigators that she was not. (Compare State's Lodging A-18, pp. 3786, 3795, 3833-34, 3844, 3849 with State's Lodging A-16, p. 2440.) Sarah revealed to investigators that her parents were not happy with her relationship with Bruno. (State's Lodging A-16, p. 2440.) Alan had told Sarah that Bruno "was a waste, [and] that he did not want her to see him." (*Id*.)

On the day of the shootings, Bruno claims that he was at home sleeping on a mattress in the living room of his family's apartment when Jane Lopez, his adult female cousin who worked at the high school, called him to say that a school administrator had just made an announcement that Sarah's parents had been killed. (State's Lodging A-16, pp. 2764-65, 2789-2793.) She told Bruno to stay home, but Bruno wanted to go to the scene to find out for himself what had happened. (*Id*., pp. 2765-66, 2793.)

When Bruno arrived at the scene, he gave investigators permission to search his car. (State's Lodging A-16, p. 2766.) Later, pursuant to a warrant, Bruno gave DNA samples at the hospital, surrendered the clothing he was wearing, and had his home searched. (*Id*., pp. 2766-67.) A witness noticed that, when Sarah approached Bruno to hug him at the hospital where they were both providing DNA samples to determine whether they were involved in the shootings, Bruno did not return Sarah's embrace, but stood very straight, his arms at his side, showing no emotion toward her. (State's Lodging A-18, p. 3628.) Bruno was cleared as a suspect and called as a State's witness at trial.

Beyond the physical evidence at the crime scene, investigators learned that Sarah and her mother had had a rocky relationship for several years, and that the shootings took place on the heels of several contentious incidents between Sarah and her parents over Bruno.

The evidence at trial showed that Sarah argued and fought with her mother often. (State's Lodging A-19, pp. 4521-23.) The fighting included physical altercations. (*Id*.) A neighbor, Dorothy Schinella (Dorothy), testified that Sarah said "that she absolutely could not stand her mother." (State's Lodging A-16, pp. 2507-08.) Dorothy testified that, a year before the shootings, she heard Diane weeping in the backyard, Sarah yelling in the house, and Alan saying to Sarah, "You go out there and you apologize to your mom." (*Id*., pp. 2508-09.) Several months before his death, Alan had told Dorothy that Sarah treated Diane in a mean and ungrateful manner, even though Diane did many kind things

for Sarah. (State's Lodging A-16, pp. 2549-50.) A fellow jail inmate testified at trial that Sarah "thought her mom was a bitch." (State's Lodging A-18, p. 3847.)

In the weeks before their deaths, Diane and Alan had forbidden Bruno from attending a family wedding at their house, which made Sarah upset. (*Id.*, pp. 2769-70.) A few days before the deaths, Sarah had lied to her parents, saying she was spending the night at a girl friend's house, but instead had spent the night at Bruno's apartment. Alan and Diane had desperately called around to find her. (State's Lodging A-15, p. 1610.) When Alan had learned that Sarah was at Bruno's, he went to confront Bruno and bring Sarah home. (State's Lodging A-16, p. 2762.) Alan told Bruno, "If you don't leave Sarah alone, I'm going to hit you and put you in jail." (*Id.*) Sarah said Alan "was devastated" over the spend-the-night incident, and that he "cried over" it. (*Id.*, pp. 2441, 2450.)

Alan and Diane grounded Petitioner from using her car after Alan found her at Bruno's. (State's Lodging A-15, pp. 1610-11.) Alan and Diane spoke to Sarah about bringing statutory rape charges against Bruno. Sarah was concerned and said, "he's 19 and I'm 16, and you, know, I didn't want him to go to jail." (State's Lodging A-16, p. 2442.) After Bruno turned against Sarah to testify for the State, she told a fellow jail inmate that "when this was all over, … she would be out on the outside, and Bruno would be the one incarcerated." (State's Lodging A-18, p. 3849.)

Several people testified that Sarah was not acting like herself shortly before the shootings. They thought it was odd that Petitioner stated, in an uncharacteristic manner,

that she agreed with the reasoning for being grounded. (State's Lodging A-16.) Witnesses also testified that, at volleyball practice the evening before the murders, Sarah was serious and solemn, played harder and better than she had before, and did not engage in laughter and conversation with her teammates. Bruno described Sarah's mood as "weird" on the evening before the shootings. (State's Lodgings A-16, p. 2764.)

Sarah did not testify at trial, but the prosecution brought forward an unusually large number of witnesses who testified about an unusually large number of variations in Sarah's description of the events surrounding the shootings. Sarah told Kim Richards, the woman who initially sheltered Sarah at her house after the shooting, two different stories within minutes of her arrival. (State's Lodging A-15, pp. 1520; 1528-29.) Earlier in time Sarah said or implied that her bedroom door was closed or barely cracked-open; later, she said Diane sometimes left it open after she kissed Sarah good-night. Sarah said that she was awakened by Alan's regular early-morning shower; other times she said she was awakened by the first gunshot. Instead of running straight across the hall to her parents' bedroom, Sarah told investigators she ran through the Jack and Jill bathroom, through the guest room, and into the hall. In some versions, she said she merely approached the door of her parents' room, which was propped open with a pillow, and listened; in others, she knocked on the door and called out to her mom (who did not respond); to a friend, she said she went to her parents' closed bedroom door and heard arguing before calling out to her mom; to some people she said she heard the second shot while she was in bed, and, to

others, that she heard it when she was standing in the hallway in front of her parents' bedroom. Once she said he heard a body falling. Several times she stated that she heard a sliding glass door open or close, and then other times she said she heard the front door open or close. Once she stated she heard someone take off running out the front door. Early in time, she said he did not look in her parents' bedroom and did not see anything. Later on, she said that she saw blood on the walls and floor and saw the bathroom light shining on the bed; she said she would have to live forever with what she saw. (State's Lodgings A-15, pp. 2099-2101; A-16, pp. 1750, 1748-40, 1750, 1812, 2427-2429; A-18, pp. 3529, 3687-3688, 3820.)

Sarah's stories about what she heard, saw, and did after the shootings are accompanied by a subplot—that a cleaning lady from Whirlwind Services had killed her parents. This subplot emerged immediately. Within a few hours of the shootings, Lorna Kolash (Lorna), Sarah's godmother, came to visit her at the Richards' home. When Lorna had asked what had happened, Sarah did not talk about the shooting incident that had just taken place, but instead had responded:

> The cleaning lady came, she took a bunch of my mom's stuff. She had been harassing my mom, she called her on the phone. She came to volleyball, yelled at her. And I heard them arguing in the middle of the night, and I got up.

> The lights were on outside, and I got up, and I asked my dad and my mom what was going on. And they told me it was just the cleaning lady, don't worry about it, go back to bed.

(State's Lodging A-18, p. 3622.)

Similarly, Sarah told Karen Chase, Diane's first cousin, that the cleaning lady had confronted Diane at a volleyball game. (*Id*., pp. 3720-021.) No one corroborated the allegation that the cleaning lady had confronted Diane at a volleyball game. (State's Lodging A-18, pp. 3713-14.)

Sarah told investigators that, when she returned from volleyball practice on Monday night, she found Diane upset and crying because the cleaning lady had called and threatened her. Sarah reported that the cleaning lady had told Diane that she had been fired from Whirlwind Services and now had no way to support her child. Diane allegedly told Sarah she intended to call police the next morning to report the stolen lotion.

An implausible element of Sarah's cleaning lady story is her story about having woken up at about 2:30 a.m. on the day of the shootings because she heard someone in the backyard. She said she immediately had woken up Alan and Diane, who looked in the backyard, saw a light on in the guest house even though Mel was out of town, identified the trespasser as the enraged cleaning lady, but did nothing about it. These allegations make little sense in the context of the rest of Sarah's story. Testimony at trial indicated that Alan was very protective of his family—such as his action in retrieving his daughter from Bruno's—and would never have gone back to bed without calling the police or at least letting the dog out of the kennel if the threatening cleaning lady or other stranger

had trespassed on their property in the early-morning hours. (State's Lodging A-19, p. 4592.)

At trial, the prosecutor was especially thorough in calling all of the subplot characters as witnesses. The subplot played out this way. The family wedding that had been the subject of the dispute between Sarah and her parents went forward at the Johnsons' property as planned, albeit without an invitation being extended to Bruno.

As a surprise thank you to Diane for hosting the wedding, a relative had hired Whirlwind Services to do a one-time post-wedding house cleaning. (State's Lodging A-18, pp. 3758-60.) Robin Lehat, who owned Whirlwind, and one employee, Janet Sylten, had cleaned Diane's house. After the cleaning, Diane had called Robin and said a new bottle of Estee Lauder lotion was missing. (*Id.*, p. 3762.) Robin then asked Janet about the lotion because Robin noticed Janet had several Estee Lauder products. Janet had denied taking it and refused to return to Diane's to help Robin look for the lotion. (*Id.*, p. 3763.)

Robin and Diane had spoken again and decided that Robin would make up for the lost lotion by giving Diane a cleaning credit in the future. (*Id.*, pp. 3761-64.) The owner testified that Diane had been "really nice" about the whole thing. (*Id.*, p. 3764.) Several witnesses testified that Diane had discussed the missing lotion incident with them, had not seemed angry about it, had not said she was going to call the police, and had seemed

quite pleased with the resulting compromise that she would receive a discounted cleaning in the future. (State's Lodging A-18, pp. 3761 to 3764.)

Janet lived on Robin's property. Janet testified that her current boyfriend, Russ Nuxoll, was Robin's ex-boyfriend. Not surprisingly, Robin and Janet had been having problems with each other before the lotion incident. Janet testified that she had refused to go to Diane's house to look for the lotion because she already had planned to help Russ with his hand-made willow furniture manufacturing business that day. While Janet was at Russ's, Robin put all of Janet's belongings outside and left her a note that she was fired. (State's Lodging A-16, p. 232.) Janet testified that she was not really upset over being fired from Whirlwind, because she preferred working at her other job building furniture with Russ. (*Id.*, p. 2814.)

After Robin and Janet parted ways, Robin changed the locks on her property. Robin testified that Janet and Russ broke in and took some things, including a gift that Russ had given to Robin when the two had dated in the past. (State's Lodging A-18, pp. 3777-79.)

Robin, Janet, and Russ all cooperated with investigators and provided DNA and fingerprint samples. When Captain Edward Fuller (Captain Fuller) interviewed Janet and Russ the first time, they were somewhat reluctant to speak, not knowing why they were being interviewed. Nothing they said or did during the interview indicated that they had any awareness that the Johnsons had been killed. Between interviews, Janet and Russ

read the newspaper and learned that the Johnsons had been murdered; Janet and Russ freely spoke to Captain Fuller after they were aware that was the reason they were being interviewed. Janet and Russ had no clear alibis—they camped out in a wilderness area instead of having a permanent residence. Janet allowed Captain Fuller to search her belongings. (State's Lodging A-17, pp. 2886-2910.) None of the DNA or fingerprints from the crime scene matched Robin, Janet, or Russ, and they all were cleared as suspects.

As could be expected, both the prosecution and the defense relied on expert witnesses to try to explain to the jury the meaning of the physical evidence. The State's experts theorized that, because there was blood spatter form both parents on Sarah's robe and blood on the bottom of her socks, without a doubt, she was the shooter—having worn the robe backwards to protect her clothing and then discarded it. Contrarily, Sarah's experts theorized that, because there was *no* blood spatter on her hair, face, the tops of her socks, or her pants, she definitely was *not* the shooter.

The experts at trial did agree that both bedroom doors must have been open when Diane was shot, because Diane's blood and tissue flew into the hallway and into Sarah's bedroom, directly across the hall from her parents' room. To the extent that Sarah said or implied that her door or her parents' door was shut at the time of the shootings, that part of the story obviously was false. Similarly, the blood on the bottom of Sarah's socks is inconsistent with those versions of her story in which she said she knocked on her

parents' door and called out to her mother but did not see anything, because—after the first shot—blood, brain matter, clumps of hair connected to body tissue, and skull fragments sprayed into the hallway. With the indisputable facts of the open doors and the bloody aftermath from the close-range shot to Diane's head and Alan's walk from bathroom to bedside with blood pouring from his wound, it seems impossible for Sarah to have seen nothing and still gotten blood on the bottom of her socks.

Sarah's trial defense—and her continuing assertion of actual innocence—is that someone else *wearing Sarah's pink robe* killed her parents; otherwise, Sarah would have had blood spatter on her person and clothing. The prosecution tried to show that Sarah shot Diane through the comforter and sheet to shield herself from blood spatter. The experts had access to the sheets, but only to *photographs* of the comforter, because investigators did not retain the comforter as evidence. Prosecution experts opined that there were bullet holes in the comforter and the upper sheet. Defense experts believed (1) there were no bullet holes, or (2) existing holes did not bear the characteristics of being shot with a high-power rifle (soot marks, a large size, and stellate tearing of the fibers along specific lines), or (3) the holes could have been caused by propelled bone or skill fragments. (Compare State's Lodgings A-15, pp. 1970-74; A-16, p. 2314; and A-18, pp. 4181-91, 4200; with A-19, pp. 4390, 4405-06, 4861-62; A-20, pp. 5272-73, 5657-5689.)

Tim Richardson (Tim), a neighbor first on the scene, said he did not see any blood on the top of the comforter that was covering Diane's body. He thought that was

unusual—that there was no blood seepage up through the top. (State's Lodging A-15, pp. 1600-01.) George Dondero, a second neighbor accompanying Tim, also said he saw no blood on the top of the bed. (*Id.*, p. 1636.)

Officer Ross Kirtley (Officer Kirtley), the first police officer on the scene, testified that he saw blood on the lower portion of the comforter toward the foot of the bed, which was the side of the bed closest to the sliding glass door. (*Id.*, p. 1719.) It was "almost right on the corner, and on the side; it was a swipe, or it was a smear of some sort." (State's Lodging A-20, p. 5228.) That observation was consistent with Alan having moved from the bathroom, where he was shot, to the bedside, where his body was found. Officer Randy Tremble (Officer Tremble) saw blood trailing up the headboard to the wall above it, but no blood on the blanket was immediately visible. He observed no pooling of blood nor very obvious spatter on the outside of the comforter. (State's Lodging A-15, p. 1792.)

Michael Howard (Howard), a forensic scientist called by the defense, opined that the bottom sheet had to have been exposed at the time of the shooting, because there were blood droplets and pieces of tissue on it. (State's Lodging A-19, pp. 4769-76.) He concluded that Sarah could *not* have been the shooter, because the blood spatter would have settled on her clothing, and an "extremely thorough examination [was] done by several laboratories of Sarah Johnson's clothing, and absolutely no blood was detected." (*Id.*, pp. 4786-87.)

Prosecution expert and crime scene reconstructionist Rod Englert (Englert) opined that blood spatter would not necessarily have gotten everywhere. There was a void of blood spatter on the ceiling "from the light switch over and back to the east," a "void on the east wall," and a void on Diane's upper shoulder, indicating that she was covered, he testified. (State's Lodging A-18, pp. 4134, 4167-68, 4183.) It was his opinion that the void on the ceiling, marked by a "well-defined line," was created by "something down below at the origin of that blood … blocking it from going up …, and creating [a] void." (*Id.*, p. 4138-39.) Otherwise," he explained, "you'd have it all over the ceiling, 360 degrees." (*Id.*) The "void is consistent with the comforter having covered her." (*Id.*, p. 4181.)

Englert theorized that the gun was placed behind Diane's head, and the shot was fired pointing in a westerly direction to cause the spatter to go the direction it did. (*Id.*, p. 4140.) The defense expert, Howard, agreed that the shooter had to stand on the east to cause "the heavy stuff going upwards and westward." (State's Lodging A-19, p. 4871.) Englert opined that, if Diane was shot through or under the sheet, that would immediately explain what could have blocked the blood spatter and made the defining line on the ceiling and on the wall, and why there was only mist and so little body debris on the robe. (State's Lodging A-18, pp. 4181.)

Englert would not expect the shooter to have a large amount of blood on their person, their face, or their hair. (*Id.*, p. 4212.) Defense expert Rocky Mink disagreed,

opining that anyone standing in the room would have had misted blood and blood spatter on them, which he said was confirmed by the reconstruction experiments he conducted. (State's Lodging A-20, p. 5652.)

The evidence showed that Sarah had washed her face twice before hospital examiners swabbed her. Samples from Sarah's hair, face, ears, earrings, nostrils, and other exposed areas of skin were taken to be tested for traces of blood and tissue. (State's Lodging A-15, pp. 1871-72.) The tests were negative. There was no evidence that Sarah had showered (*id.*, pp.1875-76), but a bath towel was found with one end draped over the edge of Sarah's tub, and the rest of the towel extending down onto the floor. (*Id.*, p. 1903.) Experts disagreed whether Sarah could have washed the blood from her—one said yes, and the other said no, because the tests are designed to detect minute traces of blood. Sarah's brother testified that she kept a shower cap in her bathroom. It is possible that she pulled it down over her face to shoot and then flushed it down the toilet or discarded it somewhere else. Howard agreed that a shower cap "would keep blood from showing up on somebody's head." (State's Lodging A-19, p. 4898.)

Experts did not find significant blood splatter from Diane on the high power rifle. (State's Lodging A-19, pp. 4900-02.) And yet, the experts were certain that was the weapon that had killed the Johnsons.

Fingerprint and DNA evidence figured prominently in the battle of the trial experts. A big part of the dispute centered on the length of time fingerprints could last on

a non-porous surface, such as smooth gun metal, as opposed to porous surfaces, such as cardboard, where a fingerprint can be absorbed into the material and last indefinitely. An excellent summary of the evidence from both sides is contained in the state district court's order on post-conviction review:

> At trial, Tina Walthall (Wathall), a finger print examiner with the Idaho State Police, testified that she received fingerprint cards from Johnson, Bruno Santos, Alan Johnson, Diane Johnson, Mel Speegle, Janet Sylten (the cleaning lady), Russell Nuxoll (the cleaning lady's boyfriend), Matthew Johnson (Johnson's brother) and Robin LeHat (the cleaning lady's employer).

> Walthall used these print cards to compare with the prints lifted from the crime scene. After those comparisons, certain fingerprints taken from the crime scene remained unidentified, including fingerprints found on the stock of the [.264] rifle, the scope from the rifle, and two boxes of .264 shells.

> A search of the Automated Fingerprint Identification System (AFIS) prior to trial using three of the unidentified prints also revealed no match to any of the unidentified fingerprints.

> Walthall repeatedly testified that there is no way to date a fingerprint to determine when it was left. Walthall specifically stated: (1) "many, many years can pass and you might still find usable fingerprints on" paper or cardboard; (2) she has discovered prints off of nonporous surfaces more than a year later; (3) one would expect to find fingerprints more than a year old if nothing happened between "when they were deposited and when [they were] processed"; and (4) "it is probable that a fingerprint would last up to and exceeding a year, providing there has been nothing to damage that fingerprint in the interim," which is true even on a nonporous surface.

The defense called [Robert] Kerchusky to testify at Johnson's trial, and again before this court [on post-conviction review].

During the trial, Kerchusky was asked by Pangburn how long fingerprints can last. He replied, "we can't be sure how long they're going to last," but that "pretty much on my experience, after a year, they're just about gone, as far as I'm concerned," [specifically addressing his opinion that latent prints on a nonporous surface will not last more than a year].

Kerchusky further testified that fingerprints will dry up and evaporate over the course of one year. Kerchusky also agreed, however, that it is fair to say that a fingerprint on a box could last for years and years and years.

Mr. Kerchusky, however, acknowledged that aging of fingerprints on nonporous surfaces is a controversial subject because "there's so many variables as far as weather, where it's located. I mean there's so many things that come into it, there's no way in the world that anybody could write any article on it."

Kerchusky also acknowledged that fingerprints on porous surfaces can last for years and that there are some "rare" instances where a latent print that was over a year old could be found on a nonporous surface. Kerchusky further testified that although he could not determine how old a fingerprint is, he "still would have an opinion as far as whether it's a fresh print or not."

In 2009, approximately four years after Johnson's criminal trial, Walthall compared the unidentified prints from the murder scene to prints belonging to Mr. Christopher Kevin Hill [—who turned out to be a friend of Mel Speegle]. Walthall testified at the post-conviction evidentiary hearing that, of the previously unidentified fingerprints, Hill's matched those that were found on the scope, the boxes of ammunition, and the [.264] rifle.

> Kerchusky … referred to the prints on the rifle, scope, and ammunition (Christopher Kevin Hill's prints) as "fresh" because, according to him, any prints left on the gun before Mr. Speegle put it in his closet would have been wiped off by the clothes hanging in his closet and because the prints were not "etched" into the metal of the gun.

(State District Court Findings of Fact, Post-Conviction Case, State's Lodging E-7, pp. 253-54.)[1]

The jury was aware that there was a set of matching fingerprints on the scope, the high-power rifle, and the box of shells, and that the set did not match any of the carded fingerprints collected by investigators. (State's Lodging F-7, p. 6.) The jury did *not* know that the fingerprints belonged to Christopher, because that match was not made until about six years after trial. The jury knew that the shooter took care not to leave any fingerprints on the trigger, trigger guard, or bolt lever. It is unlikely that the shooter would have been so careless to leave fingerprints elsewhere on the gun and ammunition. In fact, hoping to leave past fingerprints on the gun and scope rather than wiping it clean could have been part of the shooter's plan to inculpate those who had previously handled the gun, like Mel and Christopher, diverting blame from the real shooter.

Sarah's trial lasted approximately three weeks. She was represented by lead attorney Bob Pangburn and second chair attorney Mark Rader. The State was represented by Blaine County Prosecuting Attorneys Jim Thomas and Justin Whatcott. Fourth

---

[1] This Court notes it is somewhat unclear whether the clothes were hanging above Mel's guns or lying on the top of the guns.

Judicial District Judge Barry Wood presided at the trial, because the venue had been changed from the Fifth Judicial District in Blaine County across the state to Ada County.

The jury convicted Sarah of both counts of first degree murder and a firearm enhancement. On June 30, 2005, she was sentenced to two concurrent fixed life sentences for the first-degree murders of Alan and Diane Johnson, plus a 15-year weapon enhancement. (Dkt. 1, p. 1.) Sarah asked that an appeal be filed on her behalf, but trial counsel failed to do so. (State's Lodging A-10, pp. 75-78.) New counsel filed a post-conviction action and a motion for new appeal for Sarah on April 19, 2006, which were heard by Fifth Judicial District Judge G. Richard Bevin. (State's Lodgings E-1 to E-8.) Sarah prevailed on the appeal issue. An amended judgment was entered in the criminal case, whereupon Sarah was permitted to file a direct appeal. (State's Lodgings A-10, pp. 61-86; C-1 to C-8.)

In the reinstated direct appeal action, the Idaho Supreme Court affirmed the judgment on June 26, 2008 (State's Lodging C-7), and the United States Supreme Court denied Sarah's petition for writ of certiorari on December 1, 2008. Petitioner also appealed from the portions of the first post-conviction action that were denied by the state district court. The denial of the first post-conviction action was affirmed by the Idaho Supreme Court. (State's Lodging F-7.)

Years later, on April 9, 2012, Sarah filed a successive post-conviction petition and a request for new DNA testing in state court, after she discovered the three matching

fingerprints belonged to Christopher. Both requests were denied, with the denials affirmed on appeal. (State's Lodgings G-1 through H-8.) The United States Supreme Court denied Sarah's petition for writ of certiorari. (State's Lodgings I-1 to I-4.)

The Idaho Supreme Court upheld the state district court's conclusion that the request to retest the DNA samples that were too small to be tested in 2003 did *not* have the scientific potential to produce new evidence that would show it is was more probable than not that Johnson was innocent. (State's Lodging H-8, p. 14.) To make that determination under state law, the district court examined the totality of evidence of guilt from trial through post-conviction review. *See id*. at 1253. The district court reasoned and concluded:

> Further testing might reveal the source of DNA samples found on Johnson's robe, on the gun and elsewhere, but that knowledge does nothing to establish that the source of those samples was present in the Johnson's home on the morning of the crime, that the source of those samples was the shooter, or that Johnson didn't aid and abet the murderer of her parents. Consequently, because an analysis of previously untestable DNA samples will not make it more probable than not that Johnson is innocent, her request for DNA testing will not be granted.

*Id*. at 1253–54. (State's Lodging G-1, p. 247.)

Sarah did not suggest any viable motive that Christopher Hill might have had to kill Alan and Diane. He had met them only once. There was no forced entry into either the main house or the guest house. There was no indication that robbery was a motive and nothing was reported stolen. Sheriff Femling testified that he observed "valuables

lying around" in both the main house and the guest house. (State's Lodging A-16, pp. 2414-2415.)

Christopher testified that, on the evening before the murders, he was camping out in his truck by himself some twenty miles away on open land. He did not have a particular alibi at the hearing, but said his surrounding neighbors would have seen his truck parked there that morning. (State's Lodging E-9, pp. 963-975.) There is no evidence showing that Christopher was near the crime scene in the early morning hours on September 2. The state district court specifically found Christopher credible when Hill testified at the post-conviction hearing. (State's Lodging E-7, p. 88.)

Sarah argued for the first time on successive post-conviction review that the cleaning lady, Janet Sylten, and Christopher Hill conspired to murder the Johnsons. However, as the State pointed out in its state court briefing:

> Johnson presented no actual evidence of any "connection" between Hill and Sylten. Indeed, Johnson never asked Hill about his relationship, if any, with Sylten, nor did she call Sylten as a witness at the hearing in an effort to establish any sort of relationship between Sylten and Hill. The lack of any evidence of this speculative "connection" is sufficient to reject Johnson's argument that it would be likely to produce an acquittal.

(State's Lodging F-2, p. 24 (internal record citations omitted).)

With this background, the Court turns to the motions at issue.

**RESPONDENT'S MOTION FOR PARTIAL SUMMARY DISMISSAL**

Respondent has moved to dismiss Claims One, Three, Four, Five and Six of the Amended Petition on procedural default grounds. (Dkt. 8.)

### 1. Standard of Law Governing Procedural Default

Federal habeas corpus relief under 28 U.S.C. § 2254 is available to petitioners who show that they are held in custody under a state court judgment and that such custody violates the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). The Court is required to review a habeas corpus petition upon receipt to determine whether it is subject to summary dismissal. *See* Rule 4 of the Rules Governing Section 2254 Cases. Summary dismissal is appropriate where "it plainly appears from the face of the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *Id.*

A habeas petitioner must exhaust his or her remedies in the state courts before a federal court can grant relief on constitutional claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To do so, the petitioner must invoke one complete round of the state's established appellate review process, fairly presenting all constitutional claims to the state courts so that they have a full and fair opportunity to correct alleged constitutional errors at each level of appellate review. *Id.* at 845. In a state that has the possibility of discretionary review in the highest appellate court, like Idaho, the petitioner must have presented all of his federal claims to that court. *Id.* at 847. "Fair presentation" requires a

petitioner to describe both the operative facts and the legal theories upon which the federal claim is based. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

The mere similarity between a federal claim and a state law claim, without more, does not satisfy the requirement of fair presentation. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam). General references in state court to "broad constitutional principles, such as due process, equal protection, [or] the right to a fair trial," are likewise insufficient. *See Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999).

When a habeas petitioner has not fairly presented a constitutional claim to the highest state court, and it is clear that the state court would now refuse to consider it because of the state's procedural rules, the claim is said to be procedurally defaulted. *Gray*, 518 U.S. at 161-62. Procedurally defaulted claims include those within the following circumstances: (1) when a petitioner has completely failed to raise a claim before the Idaho courts; (2) when a petitioner has raised a claim, but has failed to fully and fairly present it as a *federal* claim to the Idaho courts; and (3) when the Idaho courts have rejected a claim on an adequate and independent state procedural ground. *Id.*; *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

To be an "adequate" state ground, a procedural bar must be one that is "'clear, consistently applied, and well-established' at the time of the petitioner's purported default." *Martinez v. Klauser*, 266 F.3d 1091, 1093-94 (9th Cir. 2001) (quoting *Wells v.*

*Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994)). A state procedural bar is "independent" of federal law if it does not rest on, and if it is not interwoven with, federal grounds. *Bennett v. Mueller*, 322 F.3d 573, 581 (9th Cir. 2003).

## 2. Discussion

### A. *Claim One*

Claim One is that the district court failed to remove sua sponte, or obtain unequivocal assurance from, Juror 85, who said he did not know if he could follow the court's instructions. Sarah asserts the presence of Juror 85 on the jury violated her Sixth Amendment right to a jury trial and Fourteenth Amendment right to a fair trial. Sarah raised this issue on direct appeal, but the Idaho Supreme Court declined to rule on the merits of this claim for failure to raise it in the trial court. Respondent argues that this claim is procedurally defaulted in federal court, because the Idaho Supreme Court's preliminary look at the claim for procedural purposes should not tie its hands as a decision on the merits when that was not the intent of its limited review. Because the procedural default issue is complex and the claim is without merit, the Court will forgo the procedural default analysis and deny the claim on the merits.

During voir dire, Juror 85, a hydrologist by profession, answered affirmatively when asked if he thought he could be a fair and impartial juror in the case. (State's Lodging A-12, pp. 414-15.) Near the end of voir dire, after Sarah passed the panel for cause, the judge asked if anyone had any final reason he or she believed would prevent

them from sitting as a fair and impartial juror in the case. (*Id.*, p. 512.) Juror 85 then said:

"I feel it would be difficult to—if somebody presented evidence and it was thrown out on

say a technicality, I think it would still weigh heavily on my mind." (State's Lodging A-

12, p. 512.) The Court asked for more explanation. (*Id.*) Juror 85 responded: "I'm not

sure how these things work. However, if evidence was presented by a specialist, and then

for some reason you would tell us to completely disregard that, and I felt that it was good

evidence, then I don't know if I could completely disregard it." (*Id.*, pp. 511-12.)

The trial judge then explained:

> The admissibility of evidence—and you'll receive a
> jury instruction on this, but the admissibility of evidence
> during the course of a trial is governed by the rules of law, all
> right, and there can be a lot of reasons why something is
> either admitted or not admitted.

> The only time I would tell you to disregard it is if the
> evidence came in before somebody could make the objection.
> Usually, that happens beforehand. But I will ask counsel to
> note that, abut I appreciate your concern and your candor.

( State's Lodging A-12, p. 513.)

The trial judge finally explained to the entire group:

> One of the things I'm asking you people is I
> understand that sometimes it's a process. You know, someone
> may say something that takes a while for whatever reason to
> take action or fully comprehend or whatever.

> What we want to do while we still have a big enough
> group here is if someone really has something they need to
> talk about, that we talk about it now.

* * *

> I'm clearly not trying to discourage anybody from
> serving or any of that. I just want to know if there's any last-
> minute "on, you know, I probably should have told you
> something." Or "I talked to my boss and he really doesn't
> want me there" or, you, know, whatever."

(*Id.*, pp. 514-15.)

The trial judge indicated that jurors with questions would be taken to chambers to

privately discuss their concerns. Among the jurors who raised their hands to participate

was Juror 85. (*Id.*) In the review of these jurors, the following colloquy occurred:

> Judge:        With respect to number 85, the hydrologist, his
> concern was if the court rejected some evidence
> that he thought should be in. I'll leave this to
> you people, if you want to talk to him more or
> not. You guys can decide that, all right.
>
> Let's start with number 2.
>
> Law Clerk:   2, 19?
>
> The Court:   45. I don't know that we need 85. Do you want
> 85 or not?
>
> Mr. Thomas: I don't think so.
>
> Mr. Pangburn: No.
>
> The Court:   No, he stays. 2, 19, 45, 86, 105 and then—

(*Id.*, p. 516.)

The proper standard for determining whether a juror is qualified to sit on a jury is

"whether the juror's views would 'prevent or substantially impair the performance of his

duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*,

469 U.S. 412, 424 (1985). Potential jurors must be dismissed from the juror pool where they make it "'unmistakably clear' that they could not be trusted to 'abide by existing law' and 'to follow conscientiously the instructions' of the trial judge." *Lockett v. Ohio*, 438 U.S. 586, 595–596 (1978) (quoting *Boulden v. Holman*, 394 U.S. 478, 484 (1969)). It is entirely appropriate for a party to "insist" on a jury comprised of individuals who "will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams v. Texas*, 448 U.S. 38, 45 (1980).

For example, where a juror unequivocally states that she opposed the death penalty, that she would not impose it under any circumstances, and that she would not follow the court's instructions if placed on the jury, the trial court properly excused her for cause because her responses "clearly indicated that her views on the death penalty would have prevented, or substantially impaired, her performance of duty in accordance with the law and her oath." *Russell v. State*, 607 S.2d. 1107, 1112 (Miss. 1992).

In Sarah's case, the Idaho Supreme Court determined that Sarah waived the right to object to Juror 85 remaining on the panel:

> Counsel for both sides stated that they did not wish to further question Juror 85. Counsel then questioned other jurors and after further questioning had the opportunity to object to those jurors remaining on the panel. Thus, both attorneys were given the opportunity to again challenge for cause those jurors who had expressed concern. Nonetheless, Johnson chose not to further question or challenge Juror 85 after he stated he was unsure whether he could disregard certain evidence.

(State's Lodging C-7, p. 12.) Alternatively, the Idaho Supreme Court concluded:

> Johnson has failed to demonstrate she was prejudiced by
> Juror 85's presence on the panel. Juror 85's concern was that
> he may have difficulty completely disregarding evidence
> from a specialist. Johnson has pointed to several instances
> where the judge instructed the jurors to disregard certain
> information. However, in most of those instances either the
> evidence did not come from a specialist or after an
> appropriate foundation was laid, the evidence was allowed.
> The only relevant instance of any such instruction Johnson
> pointed to occurred when the judge instructed the jury to
> disregard testimony by an expert witness that it was possible
> during the manufacturing process of making the latex glove,
> someone's DNA could have gotten inside the gloves. This
> single instance of the judge instructing the jury to disregard
> evidence presented by a specialist is insufficient to show
> Johnson sustained any prejudice by Juror 85's presence on the
> panel.

(*Id.*, p. 13.)

This Court agrees that Sarah waived this issue when her lawyers decided not to

further question Juror 85. Even though Juror 85 still had concerns *after* the judge's

explanation, Sarah's counsel did not think it was necessary to question Juror 85 further.

Sarah's counsel *could have* voiced disagreement with the judge's suggestion to bypass

Juror 85 and asked for further in camera questioning. That would have been a natural and

expected part of advocacy. But they did not. And that is where the element of *demeanor*

must be considered.

This Court must give adequate deference to the fact that the judge and each

counsel made their individual decisions based upon numerous hours of observing and

listening to Juror 85—and all of them came to a quick consensus. In comparison, this

Court is merely reviewing a paper transcript. In *Uttecht v. Brown*, 551 U.S. 1 (2007), the

United States Supreme Court explained the importance of deference to those who

observed the jurors when determining a question about "Juror Z" in that case:

> Juror Z's answers, on their face, could have led the trial court to believe that Juror Z would be substantially impaired in his ability to impose the death penalty in the absence of the possibility that Brown would be released and would reoffend. And the trial court, furthermore, is entitled to deference because it had an opportunity to observe the demeanor of Juror Z. *We do not know anything about his demeanor, in part because a transcript cannot fully reflect that information but also because the defense did not object to Juror Z's removal.* Nevertheless, the State's challenge, Brown's waiver of an objection, and the trial court's excusal of Juror Z support the conclusion that the interested parties present in the courtroom all felt that removing Juror Z was appropriate under the *Witherspoon–Witt* rule. *See Darden*, 477 U.S., at 178, 106 S.Ct. 2464 (emphasizing the defendant's failure to object and the judge's decision not to engage in further questioning as evidence of impairment).

*Id*. at 17–18 (emphasis added).

Likewise, the United States Supreme Court's discussion of "Juror Murphy" in

*Darden v. Wainwright*, 477 U.S. 168 (1986), a case cited in *Uttecht*, proves to be a fitting

analogy for the Juror 85 question:

> The precise wording of the question asked of Murphy, and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty. But Witt recognized that "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a

catechism." 469 U.S., at 424, 105 S.Ct., at 852. The trial court, "aided as it undoubtedly was by its assessment of [the potential juror's] demeanor," *id*., at 434, 105 S.Ct., at 857, was under the obligation to determine whether Murphy's views would "'prevent or substantially impair the performance of his duties as a juror,'" *id*., at 424, 105 S.Ct., at 852. In making this determination, the trial court could take account of the fact that Murphy was present throughout an entire series of questions that made the purpose and meaning of the *Witt* inquiry absolutely clear. No specific objection was made to the excusal of Murphy by defense counsel. Nor did the court perceive, as it had previously, any need to question further. Viewing the record of voir dire in its entirety, we agree with the reasoning of the Court of Appeals that the trial court's decision to exclude this juror was proper. 767 F.2d, at 754.

*Id.*, p. 178.

The Court agrees that the transcript in this case does not support Sarah's assertion that her due process rights were violated by Juror 85's presence on the jury. After experiencing the entire voir dire session and observing Juror 85 throughout, the judge, defense attorney, and prosecutor agreed that they did not need to pursue Juror 85's concerns any further. The lack of concern by either counsel, and the fact that nothing in the record shows that Juror 85 unequivocally communicated an inability to be a fair and substantially unimpaired juror, support the conclusion that the trial judge had no sua sponte duty to remove Juror 85.

This Court also agrees with the Idaho Supreme Court's alternative conclusion—that Sarah is unable to show prejudice. In only one instance did the trial judge order the jury to disregard expert testimony—and that was *speculative and unimportant* testimony.

Some background information is helpful to understand why the order to disregard a single answer of DNA expert Cynthia Hall (Hall) was inconsequential in light of the entire record. During testing of the evidence in the State's DNA lab, a trainee analyst inadvertently contaminated the testing with her own DNA. When this was discovered, Hall retested the samples. On redirect examination, the following colloquy occurred:

Hall:      What makes [an identification] unique is that we are looking at 16 different markers; and it's very, very difficult – And again, with a match at all 16 markers, that is considered a unique profile; because it's going to be very difficult to find two random people in the population that are going to match at every single one of those alleles across all 16 markers.

Prosecutor:   And by using those 16 markers, is that why DNA, frankly, is used in so many instances to accurately determine whether or not someone was at a scene or not?

Hall:      It determines whether or not someone is the source of a particular sample.

* * *

Prosecutor:   Did in fact the contamination appear in any of the samples that were sent to you from this crime scene?

Hall:      No. It was isolated to the reagent blank, or the negative control.

* * *

The purpose of the negative control—There are actually two negative controls in the process, which are very similar.

This particular control is introduced at the very beginning of the process and is carried through the entire analytical process. It contains all of the chemicals and reagents that are used throughout the process, and I am not adding any DNA. I'm not physically adding a DNA sample to that.

The purpose is to test the reagents, to determine if contaminated reagents were present. And in this particular instance, there was a contaminated reagent.

Prosecutor: And this occurred after you tested the latex glove and the robe, correct?

Hall: That's correct.

Prosecutor: And if I understand your testimony correctly, you stated that you went back and checked the samples that you had tested with this particular reagent, and looked at it at a lower threshold, is that correct?

Hall: Yes.

Prosecutor: Explain why you did that, just a little bit more thoroughly.

Hall: The reason I did that is because the contaminant, if it was present in a lower proportion than the DNA from the samples, I may not have detected it at the normal analysis thresholds; so I wanted to lower that bar to see if there was a contaminant present, but at a lower level than I may not have seen initially.

Prosecutor: And again, even if it were in the samples that you testified to that you tested, would it affect the results of the DNA profile of Sarah, Alan, and Diane?

| | |
|---|---|
| Hall: | As I mentioned earlier, it's not going to change the DNA results from the DNA that's present in that sample. It would show up as an additional contributor; basically, a mixture in that sample. |
| Prosecutor: | And until you would test it against that known profile, it would show up as an unknown profile, correct; unless you tested it against hers? |
| Hall: | Right. Prior to comparing it to this analyst's DNA, it would have been an unknown in this particular case. |
| Prosecutor: | You previously testified that based on your experience, that the gloves that you use, because they're not necessarily surgical quality, are sometimes not sterile, correct? |
| Hall: | That's correct. When they're purchased, they're not certified as being sterile. And once the box is opened, they're exposed to air, which would make them nonsterile. |
| *Prosecutor:* | *Is it possible that during the manufacturing process or packaging process, somebody might have got their DNA inside that?* |
| *Hall:* | *It's possible.* |
| *Mr. Rader:* | *Objection.* |
| *Mr. Thomas:* | *Your Honor, he's asked a lot of possibilities.* |
| *Mr. Rader.* | *Objection. I'm not asking—I didn't ask her about how the gloves are manufactured, and I don't think she has the qualifications to talk about it.* |
| *The Court:* | *Without a foundation, I'll sustain the objection. Instruct the jury to disregard her answer.* |

(State's Lodging A-17, pp. 3197-3202 (portion at issue italicized).)

Reviewing Claim One in context leads the Court to conclude the claim is nearly frivolous. There was no foundation laid to permit the DNA expert to testify about how latex gloves are manufactured. This situation could not have posed a great dilemma for Juror 85—what he was worried about was a situation where an expert *was* qualified to testify about something but the court would instruct that specialized knowledge to be disregarded. All that Juror 85 was asked to disregard here was a foundationless, speculative answer that it was possible for someone to have gotten their DNA inside the glove during the manufacturing or packaging process. There was no prejudice from the instruction to disregard one sentence of testimony addressing a mere possibility.

Finally, even if Juror 85 did *not* follow the court's instruction to disregard the expert's opinion that someone else's DNA could have been deposited inside the glove during the manufacturing process, causing Juror 85 to believe that the unidentified DNA resulted from a manufacturing error rather than an unidentified shooter, the defense presented little or nothing to show that someone else was involved in the shootings. The "disregard" instruction affected only a minute piece of evidence in contrast to the large body of varied evidence pointing to Sarah as the shooter. The Court agrees that no prejudice resulted from Juror 85's presence on the jury. This claim will be denied on the merits for failure to show that Sarah's federal constitutional due process rights were violated. Claim One will be dismissed with prejudice.

## B. *Claim Three*

Respondent asserts that Claim Three, consisting of four separate Sixth Amendment ineffective assistance of counsel subclaims, is procedurally defaulted because Sarah withdrew her subclaims after conceding they were procedurally barred by Idaho Code § 19-4908, as interpreted by *Murphy v. State*, 327 P.3d 365 (Idaho 2014). In *Murphy*, the Idaho Supreme Court determined that an assertion of ineffective assistance of initial post-conviction counsel cannot be used to excuse the failure to bring a claim in an initial post-conviction petition.

When Respondent raised the *Murphy* issue in a motion for summary dismissal on successive post-conviction review, Sarah responded:

> *Murphy* now appears to present a bar to [claims 2-5]. Accordingly, [Sarah] will file a Petition for Writ of Habeas Corpus raising the ineffective assistance of counsel claims. . . . Now that *Palmer* has been overruled by *Murphy*, *Martinez* permits [Sarah] to raise the ineffective assistance of counsel claims in this petition directly in federal court and bypass the state courts entirely.

(State's Lodging H-8, p. 19.)

The Idaho Supreme Court concluded that this statement constituted a withdrawal and "intention to abandon those claims in state court and pursue them in federal court." *Id*. The court particularly determined that it need not address the claims because Sarah "provided no argument as to why the claims should be allowed despite our ruling in *Murphy*." *Id*. Therefore, Claim Three is procedurally defaulted in federal court for two

reasons: primarily, for failure to raise the claims in the first post-conviction petition, contrary to the Idaho statute governing post-conviction actions; and, secondarily, for withdrawal of the claims without giving the Idaho Supreme Court an opportunity to address the claims.

Even after determining the claims were procedurally barred on state grounds, the Idaho Supreme Court nonetheless addressed and affirmed *Murphy* to "provide future guidance." *Id.*, p. 21. Sarah had argued that the Idaho Supreme Court should overrule *Murphy* based on the United States Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1 (2012). The Idaho Supreme Court rejected that suggestion, reasoning, "[b]ecause the holding in *Martinez* is not a constitutional holding, it is not binding on state courts." *Id*.

The Idaho Supreme Court went on to observe: "*Martinez* simply means such claims will not be procedurally defaulted in federal habeas proceedings and the federal court will have to address those claims on the merits." This Court adds clarification to that observation. Such claims do not lose their status as being procedurally defaulted, but *Martinez*—if applicable—provides an excuse for the procedural default. *Martinez* is a very narrow and difficult-to-meet exception, as are the traditional excuses of cause and prejudice and actual innocence under *Coleman v. Thompson*, 501 U.S. 722 (1991).

Because the exception is so rarely applied, choosing to "bypass" state appellate review should be done with extreme caution. Once there is no further mechanism for

bringing a claim before the Idaho Supreme Court in a procedurally proper way, a petitioner is free to come to federal court with her claim and her excuse, but, as noted above, the hurdle to jump before a merits review is granted is very high. Instead of a "bypass," it seems prudent to give the Idaho Supreme Court an opportunity to review the substance of procedurally defaulted claims *and* to review the continuing efficacy of its state procedural bars. A common law system means that the law is constantly evolving, but it often does so only when a particular set of facts meets a particular set of justices. At some point in time, the Idaho Supreme Court may change its position—which is just what happened, when—after 20 years of defense attorneys arguing that post-conviction is essentially the "direct review" for ineffective assistance of counsel claims and should be treated as such—a particular set of United State Supreme Court justices modified *Coleman v. Thompson* in *Martinez v. Ryan*. Therefore, "bypassing" the high state's appellate court may be more harmful than helpful to defendants.

A preliminary review of the four subclaims leaves the Court questioning whether the claims meet the substantiality threshold of *Martinez v. Ryan*. As a matter of judicial efficiency, rather than go through the complicated procedural default excuse analysis, the Court will first entertain Claim Three on the merits. If any subclaim appears meritorious, the Court will return to the procedural issues.

In their upcoming briefing on the merits, the parties should address the following:

*(1) Claim 3(A): Intentional Destruction of Evidence*

Sarah asserts that trial counsel acted ineffectively in failing to file a motion to dismiss under *Arizona v. Youngblood*, 488 U.S. 51 (1988), based on the fact that the State discarded the comforter covering Diane's body instead of keeping it for evidence. In *Youngblood*, the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58.[2]

There is little, if any, evidence in the record that the comforter was discarded in bad faith; other items from the room were not collected, such as the telephone, Kleenex box, or lamp, even though they had blood spatter on them. Photographs of the comforter were taken, and witnesses testified about the condition of the comforter shortly after the shootings. A massive amount of evidence was collected, including over 1600 fingerprints. The parties should particularly address whether there is any evidence of bad faith destruction of evidence.

*(2) Claim 3(B): Cleaning Lady's Parole Status*

Sarah complains that her trial counsel failed to present evidence of Janet Sylten's parole status at the time of the murders. However, Blaine County Sheriff's Office Captain Edward D. Fuller testified in front of the jury that Janet "was initially concerned about talking to us, based on being on parole. But she was freely talking to us about – about

---

[2] Such "potentially useful information" is to be distinguished from "material exculpatory evidence" addressed in *Brady v. Maryland*, 373 U.S. 83 (1953). *Illinois v. Fisher*, 540 U.S. 544, 548 (2004).

where she was." (State's Lodging A-17, p. 2889.) Fuller also mentioned Janet's parole status a second time during his testimony. (*Id.*, pp. 2895-96.) The parties should address whether these references sufficiently informed the jury of Janet's parole status. In addition, if the state post-conviction court made factual findings that apply to this claim, the parties should address them.

### (3) Claim 3(C): Prosecutorial Misconduct

Sarah asserts that her trial counsel failed to object to prosecutorial misconduct throughout the trial (invoking the sympathy of the jury in the opening statement and arguing in a manner to suggest that Sarah was required to disprove that she killed her parents). The parties shall brief the merits of this claim in the next stage of this proceeding.

### (4) Claim 3(D) Jury's Trip to Crime Scene

Sarah asserts that trial counsel failed to object to the jury's trip from Ada County to Bellevue to view the Johnson house (after it had been cleaned of the aftermath of the shootings). The parties should particularly address whether the failure to object resulted in prejudice to Sarah's defense.

## C. Claim Four

Sarah asserts that she was denied her Sixth and Fourteenth Amendment rights to effective assistance of counsel under *United States v. Cronic* when her appointed counsel labored through the proceedings under an actual conflict of interest. In particular, she

asserts that her trial counsel had a dispute with the county over the amount he was to be paid for his attorney services under their contract. This claim is procedurally defaulted for the same reason addressed in the section addressing Claim Three, above.

The Court does not see any connection between the subject matter of the conflict of interest and the work counsel performed for Sarah. The parties will be ordered to brief this claim on the merits and particularly address the alleged causal connection and any state court findings of fact related to this claim.

### D. Claim Five

Sarah asserts that she was denied her Sixth Amendment right to effective assistance of counsel on direct appeal on two factual bases: (A) failure to raise district court error in denying the motion to suppress the testimony of Malinda Gonzalez; and (B) failure to raise argument that fixed life sentences were both excessive and unconstitutional. Again, the Court concludes that these claims are procedurally defaulted based on the reasoning addressing Claim Three, above. The parties will be ordered to brief this claim on the merits and particularly address the alleged causal connection and any state court findings of fact related to these claims.

### E. Claim Six

#### 1) Procedural Default

Sarah asserts that she was denied her Fifth Amendment right to due process when the State withheld material exculpatory evidence that the fingerprints found on the scope,

rifle, and ammunition box insert had been run through AFIS and matched to Christopher

Hill after trial, under *Brady v. Maryland*, 373 U.S. 83 (1953).

In the initial post-conviction action, Sarah raised this issue only as a "newly

discovered evidence" claim, based on state law grounds. She did not cite *Brady* or raise

any constitutional basis for her claim. She raised the *Brady* claim in the successive post-

conviction, but withdrew it as with the other claims discussed above. (State's Lodgings

E-3, F-1, G-1.) Hence, it, too, is procedurally defaulted.

    2) <u>Merits</u>

Alternatively, the Court concludes that *Brady* is simply inapplicable at the stage of

proceedings when the fingerprints were finally matched to Christopher Hill. It is well

established that the prosecution has a duty under the Due Process Clause of the

Fourteenth Amendment to disclose exculpatory evidence to the defense that is material to

guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (following

*Brady*). A meritorious *Brady* claim contains three essential components: (1) the evidence

must be favorable to the accused, either because it is exculpatory or impeaching; (2) the

prosecution must have withheld, *during trial or sentencing*, the evidence, either

intentionally or inadvertently; and (3) the evidence must be material to guilt or

punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (emphasis added).

Here, it is undisputed that, at the time of trial and sentencing in 2003, government

agents and prosecutors did not know that the three fingerprints matched Christopher Hill.

Rather, his fingerprints were deposited into the electronic database in 2007, and the government agent found the match in 2009, but did not disclose that to Sarah's counsel—who found out from a third party. Evidence that is discovered *by the government* after trial may be the subject of a new trial motion, but it may not be the subject of a *Brady* claim, because the evidence was not known *during trial or sentencing* and therefore could not have been withheld intentionally or inadvertently during that time frame. This claim will be denied on the merits and dismissed with prejudice.

The Court now turns to Sarah's request for discovery and appointment of counsel.

## MOTION FOR DISCOVERY

### 1. Items Requested

After sixteen years, Sarah desires to test the following items:

- Bloodstain 2 from the robe, which contains a mixture of at least three individuals including an unknown individual.

- Tissue from the left collar area of the robe which is from an unknown male.

- Bloodstain C on the .264 caliber rifle, which is from an unknown male excluding Alan Johnson and Bruno Santos.

- Samples where no conclusions could be reached due to insufficient amounts of DNA.

- Robe samples #24-30, which were never analyzed.

- The results from robe sample 34, if any, which are not listed on the Cellmark DNA report.

- DNA from the unidentified fingerprint on the .264 round (Item #14).

- DNA from the unidentified fingerprints on the doorknob on Diane and Alan Johnson's bedroom door (Items #15-16).

- DNA from the palm prints (Items 20-2 and 20-3).

- DNA from the print on the empty shell casing (Item 12-1).

- The hair samples recovered from the barrel of the .264 rifle that could not be matched to Sarah or any of her maternal relatives by mitochondrial DNA testing.

- The two hairs removed from Bruno Santo's sweater that were excluded as coming from Sarah and could not be identified as coming from a particular maternal line.

- DNA from an unknown contributor found on the inside of the latex glove.

- Low levels of DNA from an unidentified source that were found on the leather glove from the garbage can.

- A bloody handprint that was found on the sheet under the pillow beneath Diane.

Sarah also desires to depose her trial attorneys and her post-conviction attorney to aid in showing cause and prejudice for the default of the claims set forth above.

### 2. Standard of Law

Sarah seeks discovery in aid of her quest to show that the procedural default of her claims should be excused because she is actually innocent. She is well aware that actual innocence is not a stand-alone habeas corpus claim, but merely a gateway through which she might have her cognizable procedurally-defaulted claims heard.

The strict statutory restrictions on presenting new evidence in federal habeas proceedings do not apply to requests for discovery to show actual innocence to excuse a claim's procedural default. *Dickens v. Ryan*, 740 F.3d 1302, 1320-21 (9th Cir. 2014) (en

banc) (discussing *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011), and 28 U.S.C. § 2254(e)(2)).

Nevertheless, all requests for habeas corpus discovery require a showing of "good cause." Rule 6(a) of the Rules Governing Section 2254 Cases. In the context of a request for discovery on the merits of a claim, the United States Supreme Court has defined "good cause" as circumstances "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [or she] is ... entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908 (1997)(internal citation omitted). Where the petitioner meets this standard, "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id*.

The procedural posture of the discovery question before the Court is somewhat novel. The discovery requested is not in support of the merits of a claim, as in *Bracy*, but in support of an actual innocence threshold showing to enable the Court to reach the merits of several constitutional claims. "How wide should the actual innocence gateway be?," asked one law review author,[3] and the Court echoes that question here. Even more particularly, perhaps this Court's question of law is better phrased as "How long is the pathway that leads to the actual innocence gateway?" The Court concludes that the

_____

[3] *See* Jennifer Gwynne Case, *How Wide Should the Actual Innocence Gateway Be? An Attempt to Clarify the Miscarriage of Justice Exception for Federal Habeas Corpus Proceedings*, 50 Wm. & Mary L. Rev. 669, 678 (2008) (discussing a slightly different gateway issue).

pathway must be appropriately shortened after Sarah already has traveled the length of the pathway leading to the Idaho district court and the Idaho Supreme Court. Neither is the pathway so long that any petitioner is free to engage in discovery to bolster an actual innocence assertion if the assertion she begins with is implausible. "The actual innocence gateway is not intended to provide petitioner with a new trial 'with all the attendant development of evidence, in hopes of a different result,'" observed the United States Court of Appeals for the Eighth Circuit. *Weeks v. Bowersox*, 119 F.3d 1342, 1353 (8th Cir. 1997), *cert. denied*, 522 U.S. 1093 (1998).

In its research, the Court did not find case law specifically addressing the standard for discovery of actual innocence evidence. Analogizing to the standard for discovery on the merits, the Court concludes that to warrant discovery in the threshold context, the petitioner must make specific allegations showing that she may be able to demonstrate that, in light of all of the evidence, it is more likely than not, with the totality of new and old evidence, that every reasonable juror would vote to acquit. *House v. Bell*, 547 U.S. 518, 538 (2006).

Knowing what it takes to show actual innocence helps the Court determine whether, in light of the petitioner's theory of actual innocence, it is worthwhile or futile to conduct discovery. *House* is full of useful explanations about the standard, such as the admonition that the "actual innocence analysis "does not turn on discrete findings regarding disputed points of fact, and '[i]t is not the district court's independent judgment

as to whether reasonable doubt exists that the standard addresses.'" *House*, 547 U.S. at

539-40 (quoting *Schlup*, 513 U.S. at 329 (alteration in *House*)). Rather, the court must

"make a probabilistic determination about what reasonable, properly instructed jurors

would do." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 329). Because a habeas

proceeding is not a proper forum in which to re-litigate an entire case that has already

been tried, "[w]hen confronted with a challenge based on trial evidence, courts presume

the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports

the verdict." *Id*.

In addition, where a state court has made relevant findings of fact after an

evidentiary hearing, this Court must presume that those findings are correct. The

petitioner bears the burden of rebutting that presumption of correctness by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1). *Bishop v. Warden, GDCP*, 726 F.3d 1243,

1258-59 (11th Cir. 2013).

In *Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010), the court explained:

> This all makes sense in the general scheme of things.
> AEDPA in general and Section 2254(e) in particular were
> designed "to further the principles of comity, finality, and
> federalism." *Williams v. Taylor*, 529 U.S. 420, 436, 120 S.Ct.
> 1479, 146 L.Ed.2d 435 (2000). Section 2254(e)(1) plainly
> seeks to conserve judicial resources and reflects Congress's
> view that there is no reason for a do-over in federal court
> when it comes to facts already resolved by state tribunals.
> That section also reflects Congress's respect for principles of
> federalism, recognizing that a decision to set aside state court
> factual findings intrudes on the state's interest in
> administering its criminal law. *See Miller-El v. Cockrell*, 537

U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The deference Section 2254(e)(1) requires has particular salience when a state court's determinations closely track the legal issues before the federal habeas court. Where a state court looks at the same body of relevant evidence and applies essentially the same legal standard to that evidence that the federal court does under *Schlup*, Section 2254(e)(1) requires that the state court's findings of fact not be casually cast aside. *See Miller*, 474 U.S. at 113, 106 S.Ct. 445 (citation omitted). Indeed, the cavalier treatment of such findings in federal *Schlup* proceedings would contravene the course of federal-state relations set by the Congress and the Supreme Court with great consistency over a very considerable period of time.

*Id.* at 379. Finally, "it bears repeating that the *Schlup* standard is demanding and permits review only in the 'extraordinary'" case. *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327.)

### 3. Discussion

Here, Sarah desires to revisit the jury's finding that she was the shooter. She theorizes: "If the testing of the previously untested and/or unidentified DNA on the robe, rifle, round, doorknob, palm print, hair on the rifle, Bruno's sweater, latex, and/or leather glove are shown to match Christopher Hill, Matthew Johnson, or other known persons it would go to show that person committed the crimes, not Sarah." (Dkt. 20-1, p. 8.)

As discussed above, a request for discovery based on actual innocence must be grounded in a set of facts that make sense in light of the other evidence heard by the jury. One federal district court summarized the necessary type of evidence as follows:

> In the few cases in which a federal habeas petitioner
> has been found to satisfy the *Schlup* standard, the new reliable
> evidence consisted of credible evidence that the petitioner had
> a solid alibi for the time of the crime, numerous exonerating
> eyewitness accounts of the crime, DNA evidence excluding
> the petitioner and identifying another potential perpetrator, a
> credible confession by a likely suspect explaining that he had
> framed the petitioner, evidence that called into question the
> reliability of *all of the evidence* on which petitioner's
> conviction rested, and/or evidence contradicting the very
> premise of the prosecutor's case against the petitioner. *See,
> e.g., House v. Bell*, 547 U.S. 518, 537, 126 S.Ct. 2064, 165
> L.Ed.2d 1 (2006).

*Helms v. Clark*, No. CV 07-5263GHK(PLA), 2010 WL 935784, at *2 (C.D. Cal. Mar. 11, 2010) (emphasis added).

After reviewing the 6,000-plus pages of the state court record in this matter, this Court agrees with the Idaho Supreme Court that the evidence implicating Sarah's involvement is "substantial" (*id.*, p. 13), and even "overwhelming," as the two Idaho state district court judges concluded. (State's Lodging E-7, p. 286.) There is no plausible set of facts showing that anyone aided Sarah. There is substantial evidence that Sarah was the shooter. Therefore, this Court agrees with the Idaho state courts that further discovery and testing is unnecessary.

This Court agrees that, because the former DNA testing already has shown the links among Sarah, Alan, and Diane, further testing based on the different blood spatter theories is unhelpful inasmuch as the actual innocence analysis "does not turn on discrete findings regarding disputed points of fact." *See House*, 547 U.S. at 539-40. Sarah's

argument is focused on a dispute between the two sets of experts, isolated from the remainder of the record. The jury heard all of the experts and resolved their conflicting opinions as to the material facts in favor of the State. Sarah has not presented enough here (or in any prior state court proceeding) to show that, if additional discovery were permitted, she could put forth a plausible fact pattern that could aid in a showing of actual innocence.

The experts at trial disagreed about whether the spatter on the robe could have occurred without the shooter also getting spatter on their hair and face. There was little to no expert opinion on why the gloves had gunshot residue on them but no blood and why the gun used to kill Diane did not have blood spatter on it. Neither side had a complete picture of what happened when Diane's head shattered. The actual mechanics of the blood spatter are unknowable and nonreplicable because human experiments are impossible and impermissible. Experts can never fully explain the reasons for the fact that blood spatter occurred on some items within range of the spatter and not others, but other evidence pointing to Sarah as the shooter is substantial. Evidence pointing to her involvement is overwhelming.

Other disputed points of fact are whether the comforter was pulled up and tucked in around Diane's head before or after the shooting. Did the murderer shoot through, under, or free from the bedsheet and comforter? Did the murderer have her whole body covered to avoid blood spatter, but investigators simply did not find all of the coverings?

These disputed points of fact will not be answered by additional DNA testing. That they remain unanswered does not mean the mystery is unsolved. The questions do not change the fact that so much other evidence points to Sarah's involvement in the shootings.

The murders of Alan and Diane Johnson were well-planned. The Court does not agree with Sarah that the lack of her fingerprints and the lack of her mother's blood on her person show that, if additional DNA testing is conducted, she will be able to demonstrate that it is more likely than not that every reasonable juror would vote to acquit her. The shooter certainly anticipated that there would be spatter, and that is why the robe was worn backwards and then promptly deposited in the trash can, and, likely, that is why that date was chosen for the murders, because it was *trash day*. A shooter who had the foresight to wear the robe backwards likely would have covered her face, hair, and hands. A shooter who was careful enough to leave no fingerprints on the trigger, trigger guard, or bolt lever of the gun or on the knives likely would not have left fingerprints on the gun's scope, body, or ammunition. Either gloves were worn or only parts of the gun were wiped down after the shootings. The shooter may have anticipated that the owner's fingerprints would be on the gun, inculpating him, instead of her.

What looked like a nearly perfect plan was not perfectly executed by the shooter. The shooter seems to have been slightly confused that the .25 caliber ammunition did not fit into the .22 rifle and that the 9 millimeter pistol could not be retrieved from the gun safe, causing a change of plans to the .264 rifle. The shooter probably was surprisingly

shocked by what has been described as the "carnage" that occurred when Diane was shot point blank with a high-power rifle and the fact that the full-on frontal shot to Alan did not immediately kill him, but left him to bleed to death over the next few minutes, as he pulled a towel rack and a crucifix off the wall and then stumbled to his wife's bedside. The plan miraculously was disrupted by insightful and timely police investigators saving the trash cans from being emptied that morning. The immediate aftershock of the shootings would have been enough for any human being to accidentally step in the blood with her socks, leave all kinds of bullets and a glove in her staging area, and then to mix up the story of what really happened multiple times.

It is no wonder that a perfect plan went awry, because the shootings had to have been much more brutal in person than the planner ever could have imagined in her mind. Had the plan not gone slightly awry, Sarah may have escaped liability. Not because she was actually innocent, but because she planned and executed the plan for murder extremely well.

It is quite easy for the Court to deny Sarah's discovery request based on mere speculation that her brother, Matthew Johnson, who was away at college in a different city, killed their parents. (Dkt. 20-1, p. 8.) Matthew testified he was awakened at college by a call from his fiancée, telling him that his parents had been shot and offering to drive him home. He did not arrive back in his home town until about 3:00 p.m. Sarah has pointed to no evidence, new or old, that implicates Matthew. The request for discovery

based on a new theory that Matthew was the shooter is factually implausible and even groundless.

As to Christopher Hill, Sarah had an opportunity in the state post-conviction proceedings to develop her actual innocence claim that is based on her assertion that he shot her parents. Even if her initial post-conviction attorney failed to obtain additional evidence, Sarah has had new lawyers in her service and many more years to come forward with something more that links him to the crimes.

The state district court particularly made a finding of fact that Christopher Hill was credible in his testimony that he had no involvement in the shootings. The state courts have thoroughly compared the evidence implicating Sarah and the lack of evidence implicating Christopher.

In denying Sarah's motion for further DNA testing, the Idaho Supreme Court reasoned:

> After examining the record, there is nothing to establish that any of these DNA samples came from the shooter. There is no DNA or fingerprint evidence on the trigger, trigger guard, or bolt lever of the gun. Additionally, testimony at trial was clear that there is no way to determine when any of the fingerprint or DNA samples on the gun, the shell casings, the robe, the latex glove, or the leather glove were deposited on the items. Thus, even if we view the potential outcome of the requested testing in the light most favorable to Johnson and assume that some or even all of these samples came from a single third-party source, it would—at best—show that at some unidentified point in time, and in some identified manner, such person was close enough to those items to leave their DNA on them. But, because there is no way to tell when

the DNA was deposited on the items, the evidence cannot show that such person used the gun, gloves, ammunition, or robe on the day of the murder. Therefore, the evidence has no potential to show, and again, even assuming that all of these samples came from the same person, that such person was the shooter. Likewise, the evidence cannot show that Johnson was not the shooter.

(State's Lodging H-8, p. 12.)

This Court has considered whether, as a minor child, Sarah was prompted, encouraged, or aided by an adult—which would bear, not on her conviction, but on her sentence.[4] However, the actual innocence threshold requires that Sarah show not simply

---

[4] In *Montgomery v. Louisiana*, the United States Supreme Court explained:

> *Miller* took as its starting premise the principle established in *Roper* and *Graham* that "children are constitutionally different from adults for purposes of sentencing." 567 U.S., at ——, 132 S.Ct., at 2464 (citing *Roper*, *supra*, at 569–570, 125 S.Ct. 1183; and *Graham*, supra, at 68, 130 S.Ct. 2011). These differences result from children's "diminished culpability and greater prospects for reform," and are apparent in three primary ways:

> "First, children have a 'lack of maturity and an underdeveloped sense of responsibility,' leading to recklessness, impulsivity, and heedless risk-taking. Second, children 'are more vulnerable to negative influences and outside pressures,' including from their family and peers; they have limited 'control over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievable depravity.' " 567 U.S., at ——, 132 S.Ct., at 2464 (quoting Roper, supra, at 569–570, 125 S.Ct. 1183; alterations, citations, and some internal quotation marks omitted).

> As a corollary to a child's lesser culpability, *Miller* recognized that "the distinctive attributes of youth diminish the penological justifications" for imposing life without parole on juvenile offenders. 567 U.S., at ——, 132 S.Ct., at 2465. Because retribution "relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult." *Ibid*. (quoting *Graham*, *supra*, at 71, 130 S.Ct. 2011; internal quotation marks omitted). The deterrence rationale likewise does not suffice, since "the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." 567 U.S., at —— – ——, 132 S.Ct., at 2465 (internal quotation marks omitted).

that a previously unidentified set of fingerprints *has been matched* to an adult, but that it is plausible that the adult was actually involved in the crime. Without a plausible explanation from Sarah about how and why Christopher was involved in the shootings, the request for retesting is simply a fishing expedition.

Whether acting by himself, or in conjunction with Janet Sylten, Sarah has not connected Christopher to the crime in any plausible way. Christopher would have to have known that Mel had uncharacteristically decided to stay in Boise through Tuesday, would have to have found a way to get into the locked guest house to retrieve the two rifles and mismatched ammunition, would have to have determined how to enter the main house, would have to have gone into the garage to leave the .22 rifle and .25 ammunition there, would have to have found Diane's leather gloves in her car, would have to have looked for something to shield himself from blood spatter, and would have to have squeezed himself into a female high school student's pink bathrobe (even though he was over six feet tall and 200 pounds (State's Lodging F-1, p. 28 n. 9)).

After that, as the story goes, he must have put the .25 bullets in the robe pocket, put Alan's 9 millimeter magazine with bullets and .265 bullets in different places around Sarah's bedroom, somehow found an old latex glove that Sarah had previously used (in an effort to frame Sarah) and put it on (because it had gunshot residue on it), put on the pair of women's leather gloves (because they also bore gunshot residue), found kitchen

---

*Id.*, 136 S. Ct. 718, 733, *as revised* (Jan. 27, 2016).

knives and staged them in the guest bedroom and the master bedroom (in an effort to frame gang members), killed Alan and Diane for an unknown reason *or* to help Jackie Sylten get revenge for Diane reporting the stolen lotion to her supervisor and getting her fired, dropped the right handed glove on a table in Sarah's bedroom, stuffed the small pink robe and the two left-handed gloves in the trash can—somehow knowing that Tuesday was trash day—and disappeared unnoticed. A bonus unbeknownst to Christopher was that somehow, on that very morning, Sarah was wearing the shirt with the paint stains that matched the paint residue on the inside of the robe. That scenario is implausible and not worthy of further discovery.

Trial Judge Barry Wood similarly reasoned:

> [T]o suggest to a reasonable jury such things that somebody off the street could come and find that gun in the guest house, find those bullets in the guest house, know when the parents were going to be there; find the knives in the kitchen that are hidden, the one knife that's hidden behind the microwave or bread box, whatever it was, in the dark, no less; go out past the family dog that the evidence was would bark, and the dog didn't bark. Take the same route that Sarah Johnson told the police she took out of the house, past the trash can where the robe is found. Get her bathrobe out of the bathroom next to her room, and not awaken or bother her.
>
> Both doors being open, according to her experts, the parents' bedroom door and her bedroom door. Do all of this in the dark and not disturb the parents just defies common sense.
> I think a reasonable jury could clearly find, beyond a reasonable doubt, Miss Johnson's involvement here.

(State's Lodging E-7, p. 284.)

Based on all of the foregoing, the motion for discovery will be denied. This case will proceed to the merits of the remaining claims.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion for Limited Discovery (Dkt. 20) is DENIED.

2. Petitioner's Motion for Appointment of Counsel (Dkt. 21) is GRANTED as set forth above.

3. The parties' Motions for Extension of Time (Dkts. 13, 17, 22, 27) are GRANTED.

4. The parties' Motions for Leave to File Excess Pages (Dkts. 15, 18, 24) are GRANTED.

5. Respondent's Motion for Partial Summary Judgment (Dkt. 16) is GRANTED as to Claims One and Six, which are DISMISSED with prejudice. The Motion (Dkt. 16) is CONDITIONALLY GRANTED as to Claims Three, Four, and Five. However, the Court will not entertain further briefing on excuses for procedural default this time, but shall proceed to the merits of all remaining claims—Two, Three, Four, Five, and Seven.

6. Respondent shall file an answer to the remaining claims within 90 days after entry of this Order. The answer should also contain a brief setting forth the factual and legal basis of grounds for dismissal and/or denial of

the remaining claim. Petitioner shall file a reply (formerly called a traverse), containing a brief rebutting Respondent's answer and brief, which shall be filed and served within 30 days after service of the answer. Respondent has the option of filing a sur-reply within 14 days after service of the reply. At that point, the case shall be deemed ready for a final decision.

7. No party shall file supplemental responses, replies, affidavits or other documents not expressly authorized by the Local Rules without first obtaining leave of Court.

DATED: September 18, 2019

Honorable Candy W. Dale
United States Magistrate Judge