UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SARAH MARIE JOHNSON,<br><br>               Petitioner,<br><br>vs.<br><br>AMANDA GENTRY,<br><br>               Respondent. | Case No. 4:14-cv-00395-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Petitioner Sarah Johnson (Sarah) is proceeding on her Amended Petition for Writ of Habeas Corpus, which raised six claims. Dkts. 8, 8-1. The Court conditionally granted Respondent's Motion for Partial Summary Dismissal on Claims One, Three, Four, Five, and Six on procedural default grounds, and alternatively denied Claims One and Six for their obvious lack of merit. Dkt. 30. Claims Two and Seven were properly exhausted and are ready for a merits adjudication. The Court also permitted Sarah to show that procedurally defaulted claims Three, Four, and Five qualified for the exception found in *Martinez v. Ryan*, 566 U.S. 1 (2012). The parties have submitted additional briefing requested by the Court.

The Court takes judicial notice of the records from Petitioner's state court proceedings. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1

(9th Cir. 2006). Having carefully reviewed the record in this matter, including the state court record, and having considered the arguments of the parties, the Court concludes that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Therefore, the Court enters the following Order.

**REVIEW OF CLAIMS TWO AND SEVEN ON THE MERITS**

The court reviews two claims that the Idaho Supreme Court decided on the merits: Claim Two, a Sixth Amendment ineffective assistance of counsel claim; and Claim Seven, an Eighth Amendment cruel and unusual punishment fixed life sentence claim.

**1.   Standard of Law for Review of Claims on the Merits**

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Petitioners are required to exhaust their state court remedies for each of their federal claims before coming to federal court, or their claims are considered "procedurally defaulted." That means "fairly presenting the claim" based on a federal theory to the highest state court for review in the manner prescribed by state law. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Unless a petitioner has properly exhausted their state court remedies for a particular claim, a federal district court cannot grant relief on that claim, although it does have the discretion to deny the claim. 28 U.S.C. § 2254(b)(2). The federal court reviews the state court record, in particular, the petitioner's appellate briefing and the state court decisions to determine whether a claim has been properly exhausted.

**MEMORANDUM DECISION AND ORDER - 2**

If a claim is properly exhausted, the federal district court reviews the "last state-court adjudication on the merits" to assess whether habeas corpus relief is warranted. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). In Idaho, if an Idaho Supreme Court decision summarily denies a petition for review with no explanation of why relief was denied, the federal district court "looks through" the summary dismissal and presumes the Idaho Supreme Court agreed with, and adopted the reasons given by, the Idaho Court of Appeals. *See Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Curiel v. Miller*, 830 F.3d 864 (9th Cir. 2016).[1]

The standard for review of a state court judgment that adjudicated a petitioner's federal claims on the merits is set forth in Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Relief may be granted only if the state court's adjudication of the petitioner's claim:

> 1.      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

---

[1] Where "the last reasoned opinion on the claim explicitly imposes a procedural default," the federal court is to "presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits"; however, this the presumption can be refuted by "strong evidence." *Kernan v. Hinojosa*, 578 U.S. 412, 415 (2016).

**MEMORANDUM DECISION AND ORDER - 3**

When a petitioner contests the state court's legal conclusions in a federal petition, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test. These tests require the federal court to identify specific United States Supreme Court cases of precedent that amount to "clearly established" law in existence at the time of the last state court decision.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). Importantly, § 2254(d)(1) "provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent," nor does it "license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

A federal court may not grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the

**MEMORANDUM DECISION AND ORDER - 4**

state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not permitted under § 2254(d)(1). *Richter*, 562 U.S. at 101. The United States Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

Although the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Generally, the merits of the claims in a federal habeas corpus petition are decided only on the record that was before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). Title 28 U.S.C. § 2254(e)(2) prohibits the use of new evidence (with or without an evidentiary hearing) in federal habeas matters without satisfying strict requirements. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1738-39 (2022); *Holland v. Jackson*, 542 US. 649, 653 (2004) (per curiam)).

Only in certain circumstances may a federal petitioner challenge a state's legal conclusions without satisfying AEDPA's "contrary to or unreasonable application of

**MEMORANDUM DECISION AND ORDER - 5**

clearly established law" provision of § 2254(d)(1). That provision does not apply,

clearing the way for the federal district court to review the claim de novo if: (1) the state

appellate court did not decide a properly asserted federal claim, (2) the state court's

factual findings are unreasonable under § 2254(d)(2), or (3) an adequate excuse for the

procedural default of a claim exists. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir.

2002). In such a case, as in the pre-AEDPA era, a district court can draw from both

United States Supreme Court and circuit precedent, limited only by the non-retroactivity

rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not

unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. §

2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a

state court factual determination is unreasonable, or if there are no state court factual

findings, the federal court is not limited by § 2254(e)(1), and the federal district court

may consider evidence outside the state court record, except to the extent that §

2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

In this case, a change of venue was granted from Blaine County to Ada County,

because of pretrial publicity. Fourth Judicial District Judge Barry Wood presided over

Sarah's trial and sentencing proceedings. *See* State's Lodging A-21. Blaine County

Prosecuting Attorney Jim J. Thomas appeared for the State of Idaho, and Robert "Bob"

Pangburn and Mark Stephen Rader represented Sarah in trial proceedings.

**MEMORANDUM DECISION AND ORDER - 6**

### 2.  Discussion of Claim Two

Claim Two is that Mr. Pangburn was ineffective for failing to elicit testimony from Robert Kerchusky, Sarah's fingerprint expert, that the unidentified prints found on the gun, scope, and ammunition were fresh prints and were not deposited well before the crime occurred, as the State argued at trial. Dkt. 8-1, pp. 5-13.

### A. *Ineffective Assistance of Counsel Standard of Law*

The clearly established law governing a Sixth Amendment claim of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on an ineffective assistance claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient performance. *Id*. at 684.

In assessing trial counsel's performance under *Strickland*'s first prong, a reviewing court must assess counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

In assessing prejudice under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. *Id.* at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

The *Strickland* standard, giving deference to counsel's decisionmaking, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to federal district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

**B. *Discussion***

Sarah contends that Mr. Pangburn was ineffective for failing to elicit testimony from her fingerprint expert Robert Kerchusky that the unidentified prints found on the gun were "fresh." Sarah argues that this missing testimony would have given the jury

reason to find that the unknown person who deposited the prints shot her parents. It was undisputed at trial that the owner of the gun was Mel Speegle, who rented the Johnson's over-garage apartment. After trial, the unidentified fingerprints were matched to Christopher Hill, who had been a caretaker of Speegle's ranch several years earlier. This discovery gave new life to Sarah's claim. She properly exhausted this claim in the first post-conviction matter. State's Lodging E-3, pp. 815-817.

      i.   <u>State Court Proceedings</u>

At trial, Idaho State Police fingerprint examiner Tina Walthall testified that she compared fingerprint cards from numerous individuals of interest and from the fingerprint data base with fingerprints lifted from the crime scene, including those found on the stock of the rifle, the scope from the rifle, and two boxes of .264 shells. State's Lodging A-17, pp. 3009, 3017-3018, 3027-3028, 3042-3044, 3049-3052. As of the trial date, she had found no matches. *Id*., pp.3027-3028, 3042-3056.

Walthall also testified that there is no way to date a fingerprint to determine when an item was touched, but that "[i]t is probable that a fingerprint would last up to and exceeding a year, providing there has been nothing to damage that fingerprint in the interim. *Id*., pp. 3028, 3044, 3052, 3058, 3062, 3073.

Sarah brought this claim in her initial post-conviction action before Judge G. Richard Bevan, who took over the case in 2009. In his findings of fact in 2011, Judge Bevan summarized Kerchusky's trial rebuttal of Walthall's testimony, as well as Kerchusky's testimony at the post-conviction evidentiary hearing:

**MEMORANDUM DECISION AND ORDER - 9**

> The defense called [Robert] Kerchusky to testify at Johnson's trial, and again before this court [on post-conviction review].
>
> During the trial, Kerchusky was asked by [defense counsel] Pangburn how long fingerprints can last. He replied, "we can't be sure how long they're going to last," but that "pretty much on my experience, after a year, they're just about gone, as far as I'm concerned," [clarifying his opinion that latent prints on a nonporous surface will not last more than a year].
>
> Kerchusky further testified that fingerprints will dry up and evaporate over the course of one year. Kerchusky also agreed, however, that it is fair to say that a fingerprint on a box could last for years and years and years.
>
> Mr. Kerchusky, however, acknowledged that aging of fingerprints on nonporous surfaces is a controversial subject because "there's so many variables as far as weather, where it's located. I mean there's so many things that come into it, there's no way in the world that anybody could write any article on it."
>
> Kerchusky also acknowledged that fingerprints on porous surfaces can last for years and that there are some "rare" instances where a latent print that was over a year old could be found on a nonporous surface. Kerchusky further testified that although he could not determine how old a fingerprint is, he "still would have an opinion as far as whether it's a fresh print or not."

State's Lodging E-7, p. 251.

The jury was aware that there was a set of matching fingerprints on the scope, the high-power rifle, and the box of shells, and that the set did not match any of the carded fingerprints collected by investigators. State's Lodging F-7, p. 6. The jury knew that the shooter likely took care not to leave any fingerprints on the trigger, trigger guard, or bolt

**MEMORANDUM DECISION AND ORDER - 10**

lever. There were latex and leather gloves found at the scene. Mr. Pangburn argued in

closing—based on Kerchusky's testimony that fingerprints do not last more than a year—

that the unknown prints on the gun were the only prints on the gun; therefore, that

showed that only one unknown person handled the gun within the past year, not Sarah.

State's Lodging A-11, pp. 272-74. The evidence of the unknown fingerprints that—

according to the experts must have been less than a year old—was "huge" evidence, Mr.

Pangburn argued to the jury. *Id*. at 276.

　　In determining whether Mr. Pangburn performed deficiently, Judge Bevan made

the following relevant factual findings:

- Kerchusky found fault with Pangburn because Pangburn did not specifically ask him whether the unknown fingerprints were "fresh." State's Lodging E-7, para. 233.

- Kerchusky testified that several of the prints were fresh, and that he had spoken to Pangburn during the trial, requesting that Pangburn put him back on the stand to discuss the freshness of the prints, but Pangburn declined to do so. *Id*.

- [T]he record of Pangburn's examination sets forth that he was prepared for the examination [of Kerchusky], and that he discussed various hypotheticals that brought the pertinent issue (aging of fingerprints) before the jury for Kerchusky to comment on (e.g. TT:5071-5072). *Id*. at para. 235.

　　Judge Bevan concluded on post-conviction review that Mr. Pangburn's

performance was not deficient for the following reasons:

- [T]he "defense, through Pangburn, had a definite strategy regarding the fingerprints; that Pangburn was aware of

**MEMORANDUM DECISION AND ORDER - 11**

this strategy well-ahead of his examination of Kerchusky and that he, as a matter of strategy, asked the questions he chose to ask of Kerchusky without asking about "freshness" per se. State's Lodging E-7, para 238.

- Pangburn was prepared regarding the defense fingerprint theory, and he exercised his judgment and skill in presenting those issues to the jury. He also argued the freshness of the fingerprints to the jury in his closing. (*See* Supplemental Appeal Transcript, 270:11-272:25) ("You know, these things start getting a year old, and you're just not going to see it…. Those fingerprints had not been there for very long."). *Id.*, para 239.

On appeal, the Idaho Supreme Court agreed that Mr. Pangburn's performance was

not deficient and was the result of a strategic decision:

> Johnson does not present convincing evidence that Pangburn was ineffective or that she might not have been convicted but for his mistakes. First, she provides no evidence to contradict the district court's factual finding that "Pangburn was prepared regarding the defense fingerprint theory and he exercised his judgment and skill in presenting those issues to the jury." Second, her argument that Pangburn's omission served no tactical or strategic purpose is misplaced. She argues that because further questioning of Kerchusky would have aided her case, the omission of such questioning could not be strategic. While Pangburn did not specifically ask Kerchusky if the fingerprints were "fresh," he did elicit testimony that prints do not last on a non-porous surface, like a gun, for more than a year. Pangburn's choice of words and mode of questioning in examining Kerchusky falls within the area of tactical or strategic decisions. *See Giles v. State,* 125 Idaho 921, 924, 877 P.2d 365, 368 (1994). In the absence of evidence that these strategic decisions were the product of inadequate preparation or ignorance of the relevant law, we hold that Pangburn's performance was not deficient.

State's Lodging F-7, pp. 4-5.

**MEMORANDUM DECISION AND ORDER - 12**

The Idaho Supreme Court also determined that Sarah suffered no prejudice from

the way Mr. Pangburn presented and argued the fingerprint evidence at trial:

> Moreover, Johnson has failed to show that further questioning of Kerchusky would have produced a different result at trial. Unless prejudice is presumed, the accused bears the weighty burden of demonstrating prejudice to the outcome. *Id.* In this case, Johnson does not argue that prejudice is presumed, and the record supports the district court's conclusion that the information regarding the freshness of the fingerprints was before the jury. Kerchusky testified that prints do not last on a non-porous surface for more than a year. Speegle had previously testified that, to his knowledge, the gun had not been handled since the day he moved in—over a year before the murders. And, Pangburn highlighted to the jury the theory that whoever left the unidentified fingerprints on the gun and ammunition box was the person who committed the murders. Indeed, in his closing argument Pangburn stated, "You know, these things start getting a year old, and you're just not going to see it.... Those fingerprints had not been there very long. They couldn't have been." Thus, Johnson's argument that further details concerning the freshness of the prints would have somehow changed the outcome of trial is without merit and the district court correctly denied her ineffective assistance of counsel claim.

*Id.*, p. 5.

ii.   Analysis

This Court agrees that that the state district court's factual finding and conclusion

that Mr. Pangburn's handling of the fingerprint issue was a reasonable strategic decision

is supported by ample evidence in the record. Sarah has not pointed to facts or provided

argument showing that the manner in which Mr. Pangburn handled the age of the

unidentified fingerprints was not strategic, but was the result of lack of preparation. Mr.

**MEMORANDUM DECISION AND ORDER - 13**

Pangburn, in fact, argued the age of the fingerprints in closing argument in an effective manner. The Idaho Supreme Court reasonably applied *Strickland*'s first prong in finding that Mr. Pangburn's performance was not deficient. State's Lodging F-7, pp. 3-5.

      Further, this Court concludes that, even Mr. Pangburn did not make a specific strategic decision about the extent of examination regarding the "freshness" of the fingerprints, or did not thoroughly think through strategy when rejecting Kerchusky's request to be recalled as a witness to testify about the "freshness" of the unidentified prints, Sarah suffered no prejudice under *Strickland*'s second prong.

      First, there was no need to use the specific term "fresh." Both Walthall and Kerchusky testified that fingerprints were likely to last only about a year. The only fingerprints found on the gun were the unidentified ones, leading to the logical conclusion that no "fresh" prints of Sarah's were found on the gun and that the only person to touch the gun ungloved in the last year was an unidentified person. Mr. Pangburn directed the jury's attention to the one-year mark and the unidentified prints being the only ones within that time frame, which made the same point as the testimony Sarah believes Mr. Pangburn should have elicited from Kerchusky.

      In addition, it is clear that Sarah wore gloves to handle the weapon. Two leather gloves were introduced into evidence, the right-handed one found in Sarah's bedroom and the left-handed one found wrapped in Sarah's pink robe found in the garbage dumpster, along with a latex glove containing Sarah's DNA. State's Lodging E-7, para. 29-30. Therefore, even if Mr. Pangburn had recalled Kerchusky to permit him to make a

**MEMORANDUM DECISION AND ORDER - 14**

stronger point about the "fresh" prints, and Kerchusky's theory would have survived cross-examination intact, too much other evidence pointed to Sarah as the perpetrator. Even upon the much-later identification of the prints as belonging to Christopher Hill, there still was no motive and no other evidence supporting a theory that Hill killed Sarah's parents. Hill's explanation about why his fingerprints were on the gun was reasonable—Hill said that, in 2000, he had taken the rifle out, tried to sight it, and shot it several times while he was a caretaker at Speegle's ranch. State's Lodging E-7, par. 247.

Based on all of the foregoing, the Court concludes that no additional testimony about "freshness" or evidence that the unidentified prints were Hill's would have added anything to the jury's understanding of the issue, let alone would have resulted in a different verdict, especially in light of the overwhelming evidence of Johnson's motive and guilt presented by the State at trial. *See* Dkt. 30, pp. 55-63 (Order rejecting actual innocence assertion). The Idaho Supreme Court's decision was a reasonable application of *Strickland*'s second prong, based upon a reasonable factual determination. The Court concludes that Petitioner is not entitled to relief on Claim 2.

### 3.  Discussion of Claim Seven

Sarah asserts that her two sentences of life without parole (LWOP) procedurally and substantively violate the Eighth Amendment, because she was only sixteen years old when she committed the crimes and therefore had less culpability than an adult.

**MEMORANDUM DECISION AND ORDER - 15**

**A.** *Standard of Law*

The Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions," a right that "flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Miller v. Alabama*, 567 U.S. 460, 469 (2012) (internal citation and punctuation omitted). For juvenile offenders, both substantive and procedural considerations in sentencing are required under the Eighth Amendment.

i.    Substantive Considerations

In recent decades, the United States Supreme Court has relied on the Eighth Amendment to circumscribe the extent of punishment that can be imposed upon juvenile offenders. In *Roper v. Simmons*, 543 U.S. 551 (2005), the Court prohibited capital punishment for juvenile offenders. In *Graham v. Florida*, 560 U.S. 48 (2010), the Court prohibited LWOP sentences for *nonhomicide* juvenile offenders.

In *Miller*, the Court held that the Eighth Amendment prohibits *mandatory* LWOP sentences for juvenile offenders. 567 U.S. at 465. In *Montgomery v. Louisiana*, 577 U.S. 190, 207-08 (2016)*,* the Court held that *Miller* announced a new substantive rule, which made it possible for *Miller* to be retroactive. *Id*. at 212.

Courts agree that *Montgomery* did not extend *Miller*; it addressed only *Miller*'s retroactivity. For example, in *Jones v. Mississippi*, 141 S. Ct. 1307, 1315–16 (2021), the most recent case addressing juvenile LWOP, the United States Supreme Court clarified:

**MEMORANDUM DECISION AND ORDER - 16**

> As *Montgomery* itself explained, the Court granted certiorari
> in that case not to consider whether the rule announced in
> *Miller* should be expanded, but rather simply to decide
> whether *Miller*'s "holding is retroactive to juvenile offenders
> whose convictions and sentences were final when *Miller* was
> decided." 577 U.S. at 194, 136 S.Ct. 718. On the question of
> what *Miller* required, *Montgomery* was clear: "*A hearing
> where youth and its attendant characteristics are considered
> as sentencing factors is necessary to separate those juveniles
> who may be sentenced to life without parole from those who
> may not*." *Id.,* at 210, 136 S.Ct. 718 (internal quotation marks
> omitted). *But a separate finding of permanent incorrigibility
> "is not required*." *Id.,* at 211, 136 S.Ct. 718.

141 S. Ct. at 1317–18 (emphasis added). Although *Jones* post-dates the Idaho Supreme

Court's decision in Sarah's case and therefore is not considered clearly established law

available to the Idaho Supreme Court in Sarah's case, *Jones* demonstrates that Sarah's

proposed construction of *Miller* calls for an extension, rather than a mere application, of

that case. The Court includes some citations to *Jones* in this Order for demonstrative

purposes only.

Drawing from *Roper* and *Graham*, the Court in *Miller* explained some of the

characteristics of juveniles that make them "constitutionally different from adults for

purposes of sentencing," include:

- "diminished culpability and greater prospects for reform";

- "lack of maturity and an underdeveloped sense of
  responsibility, leading to recklessness, impulsivity, and
  heedless risk-taking";

- "more vulnerab[ility] to negative influences and outside
  pressures, including from their family and peers";

**MEMORANDUM DECISION AND ORDER - 17**

- "limited control over their own environment and [a] lack the ability to extricate themselves from horrific, crime-producing settings"; and

- "a [] character [that] is not as well formed as an adult's", "traits that are less fixed", and "actions [that are] less likely to be evidence of irretrievable depravity".

567 U.S. at 471 (citations and punctuation omitted; alterations added).

Another categorical reason for exercising more care when considering LWOP sentences for juvenile offenders is that "the distinctive attributes of youth diminish the penological justifications" for imposing life without parole on juvenile offenders. *Miller*, 567 U.S. at 472. The rationale for "diminished" penological justifications includes the following:

- "Because retribution relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult";

- "The deterrence rationale likewise does not suffice, because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment";

- "The need for incapacitation is lessened, too, because ordinary adolescent development diminishes the likelihood that a juvenile offender forever will be a danger to society"; and

- "Rehabilitation cannot justify the sentence, as life without parole forswears altogether the rehabilitative ideal."

*Montgomery,* 577 U.S. at 207-08 (citations and punctuation omitted).

**MEMORANDUM DECISION AND ORDER - 18**

However, a sentencing court need not address the particular *Miller* or *Montgomery* factors in its discretionary decision to survive Eighth Amendment scrutiny, so long as evidence of youthful characteristics was presented for the sentencing court's consideration. Though *Montgomery* provided many explicit recommendations regarding youthful characteristics when it declared *Miller* a substantive rule, and *Montgomery* concluded that LWOP sentences for juveniles should be the rare exception and not the rule, its holding is nevertheless a limited one.

As recognized in *United States v. Briones*, 35 F.4th 1150 (9th Cir. 2021), *Montgomery* went beyond simply addressing retroactivity of the mandatory LWOP claim: "In dicta, *Montgomery* also appeared to extend *Miller*'s rule, suggesting that LWOP is 'an unconstitutional penalty for ... juvenile offenders whose crimes reflect the transient immaturity of youth,' i.e., 'for all but ... those whose crimes reflect permanent incorrigibility.' *Id.* at 208–09, 136 S.Ct. 718." 35 F.4th at 1153–54. Both the Supreme Court in *Jones* and the Ninth Circuit in *Briones* agree that the substantive holding of *Miller* mandates a state sentencing court to hold a hearing where "youth and its attendant characteristics are considered as sentencing factors" and that the substantive holding is *not* that a state sentencing court must make a separate or explicit finding of "permanent incorrigibility." 141 S.Ct. at 1317-18; 35 F.4th at 1153-54.

Reining in defendants who would read more into *Montgomery* than its limited holding, the *Jones* Court summarized the substantive rule very simply: "Youth matters in sentencing. And because youth matters, *Miller* held that a sentencer must have discretion

to consider youth before imposing a life-without-parole sentence, just as a capital

sentencer must have discretion to consider other mitigating factors before imposing a

death sentence." 141 S. Ct. at 1316 (citations omitted). *Jones* also reiterated that

"permanent incorrigibility is not an eligibility criterion akin to sanity or a lack of

intellectual disability." *Id*. at 1315.

ii.   Procedural Requirements

To the extent that *Miller* set forth procedures a court must follow before

sentencing a juvenile offender to LWOP, the requirements are few. The *Miller* Court

announced that its holding "mandates only that a sentencer follow a certain process—

*considering an offender's youth and attendant characteristics*—before imposing a

particular penalty." 567 U.S. at 483 (emphasis added). *See Graham*, 560 U.S. at 76 ("An

offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail

to take defendants' youthfulness into account at all would be flawed."). This Court

disagrees with Sarah that *Miller*'s discussion of discretionary versus mandatory

sentencing established a "procedure" when the *Miller* Court indicated that a sentencing

judge is required "to take into account how children are different, and how those

differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at

480.

In *Jones*, the Court clarified that particular factual findings or—as Sarah would

define them, "procedures"—are not required, and the Court explained why in great detail:

**MEMORANDUM DECISION AND ORDER - 20**

[A]n on-the-record sentencing explanation with an implicit finding of permanent incorrigibility is not dictated by any historical or contemporary sentencing practice in the States. To be sure, when a state judge imposes a sentence of imprisonment, particularly a lengthy sentence, the judge often will explain both the sentence and the judge's evaluation of any mitigating circumstances. But many States traditionally have not legally required (and some States still do not legally require) on-the-record explanations by the sentencer. *See, e.g.*, A. Campbell, *Law of Sentencing* § 10:5, pp. 473–480 (3d ed. 2004) (hereinafter Campbell). Indeed, in some States, the jury is the sentencer for certain kinds of crimes, and juries typically do not supply sentencing explanations. *See generally* King & Noble, *Felony Jury Sentencing in Practice: A Three-State Study*, 57 Vand. L. Rev. 885 (2004). Even when state law requires a sentencer to supply reasons, many States do not impose a formulaic checklist of topics or a magic-words requirement with respect to particular mitigating circumstances. And appellate courts do not necessarily reverse merely because the sentencer could have said more about mitigating circumstances. *See* Campbell 477; 22A Cal. Jur. 3d, Crim. Law: Posttrial Proceedings § 408, p. 234 (2017).

Those state practices matter here because, as the Court explained in *Montgomery*, when "a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems." 577 U.S. at 211, 136 S.Ct. 718. So it is here. Because *Montgomery* directs us to "avoid intruding more than necessary" upon the States, *ibid.*, and because a discretionary sentencing procedure suffices to ensure individualized consideration of a defendant's youth, we should not now add still more procedural requirements.

141 S. Ct. at 1321.

**MEMORANDUM DECISION AND ORDER - 21**

The *Jones* Court emphasized that *discretion* is the key to a constitutional sentencing scheme: "In a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." 141 S. Ct. at 1313. *Miller* and *Montgomery* both "definitively reject[ed] any requirement of a finding of permanent incorrigibility." *Jones*, 141 S.Ct. at 1322.

This Court now turns to the question of whether the state sentencing court met the constitutional substantive and procedural requirements set forth in *Miller* and *Montgomery* before sentencing Sarah to life without parole.

### B.  *State Court Proceedings*

The relevant state court record consists of three separate layers of adjudication: the sentencing hearing in 2005, with Judge Barry Wood presiding; the successive post-conviction action filed in 2012, with Judge G. Richard Bevan presiding; and the Idaho Supreme Court's appellate review, completed in 2017. Judge Bevan's final decision was issued after *Miller* (2012) and before *Montgomery* (2016), but he assumed for the purpose of his discussion that *Miller* would be retroactive. State's Lodging G-1, p. 252. The retroactivity question was decided in *Montgomery* before the Idaho Supreme Court issued its final decision in 2017. State's Lodging H-8.

On successive post-conviction review, Judge Bevan concluded:

> [T]he holding in *Miller* has no bearing on Johnson's situation. *Miller* held that mandatory fixed life sentences for juveniles convicted of homicide violate the Eighth

**MEMORANDUM DECISION AND ORDER - 22**

Amendment. Idaho does not have a mandatory fixed life
sentencing scheme, for juveniles or adults. Johnson's
sentence was discretionary.
        . . .
        However, assuming that Johnson's interpretation of
*Miller* is correct, Johnson admits in her Successive Petition
that her youth was taken into account at sentencing.

State's Lodging G-1, p. 251.

Judge Bevan did not hold an evidentiary hearing on Sarah's Eighth Amendment
claim, but granted summary dismissal in favor of the State. *Id.*, pp. 236-53. Judge Bevan
relied on the sentencing transcript for his summary dismissal decision.

The Court will now review portions of Judge Wood's 2005 sentencing hearing
relevant to Judge Bevan's decision on Sarah's 2014 successive post-conviction Eighth
Amendment claim. Key to the *Miller* claim, Dr. Richard Worst, a psychiatrist, and Dr.
Craig Beaver, a neuropsychologist, both testified on behalf of Sarah at the sentencing
hearing. Dr. Worst's testimony spans sixty-eight pages of the transcript. State's Lodging
A-21, pp. 6279-6296, 6303-6321, 6324-6352. Dr. Beaver's testimony is approximately
forty pages. *Id.*, pp. 6367-6414.

Dr. Worst spent nine hours in personal evaluation sessions with Sarah. He
prepared a written forensic psychiatric evaluation, which was included in the Presentence
Investigation (PSI) report. State's Lodging A-23. Dr. Worst noted that Sarah had been
depressed and had been taking Zoloft for two years before the crime. Sarah told Dr.
Worst that she had experienced conflict at home, especially with her mother. She

**MEMORANDUM DECISION AND ORDER - 23**

acknowledged having engaged in a physical altercation with her mother, where her mother "put her on the floor." *Id.*, p. 9.

Dr. Worst noted Sarah had experienced conflict with her father the week before the crime. They argued over her father going to her boyfriend Bruno's house, threatening Bruno, and telling Sarah her relationship with Bruno was over. Sarah admitted anger over that incident, but otherwise said that her relationship with her father was very, very good. She reported that her father slapped her only once, when she was being a smart aleck, but denied that he was physically abusive to her. *Id.*

Dr. Worst found no evidence that Sarah had Antisocial Personality Disorder or Conduct Disorder. *Id.* Dr. Worst diagnosed Sarah as having Major Depression and Adjustment Disorder with mixed anxiety and depressed mood and possible mild Attention Deficit Disorder of the inattentive type on Axis I of the Minnesota Multiphasic Personality Index (MMPI), 4th Ed. Because Sarah had attempted suicide the year before the crime, Dr. Worst classified Sarah's depression as ongoing clinical depression. State's Lodging A-21, p. 6306. But, Dr. Worst testified, Sarah's type of depression does not generally predispose someone to commit violent crimes; it was not "psychotic depression." *Id.*, pp. 6287-88.

Importantly, Dr. Worst diagnosed Sarah with dependent personality disorder with self-defeating and avoidant personality traits on Axis II. State's Lodging A-23, pg. 8. When asked about this diagnosis made by Dr. Worst, Dr. Beaver explained that a dependent personality means "a personality that is relatively immature and is

**MEMORANDUM DECISION AND ORDER - 24**

undeveloped." State's Lodging A-21, p. 6402. A person with dependent personality order typically is "not very likely to plan, originate or execute their own activities or plans; but they are easily led and directed by other people." *Id*. However, "because of their need to be accepted and attached to another person, they're willing to engage in behaviors that they may find reprehensible, but are needed to maintain that dependency." *Id*.

Dr. Worst also testified during the sentencing hearing that "full development of the frontal cortex and the higher centers of the brain generally isn't reached until about 18." *Id*., p. 6291. He noted that the American Psychiatric Association, the American Psychological Association, the American Academy of Adolescent Medicine, and the American Academy of Psychiatry have voiced opposition to the death penalty for juveniles based upon the scientific understanding of brain development over the lifespan. *Id*., pp. 6289-92.

Particularly, as to Sarah, Dr. Worst concluded that, "given no history of substantial prior antisocial conduct, and with a history of reasonably good school performance, good work performance, good interpersonal relationships, at least until the turmoil of her adolescence, she is rehabilitative." State's Lodging A-23, pg. 10.

After the prosecutor cross-examined Dr. Worst, Judge Wood questioned Dr. Worst. Judge Wood asked about a plan for rehabilitation, given that Sarah had not admitted committing the crime. Dr. Worst said Sarah's decision to refrain from admitting she committed the crime made it very hard for him to form an opinion about a plan for rehabilitation. "[O]ther than to say treat her depression, treat her losses, and that's about

MEMORANDUM DECISION AND ORDER - 25

all I can do," he said. State's Lodging A-21, p. 6305. He could make only a "kind of

educated guess that at some point, she will come to grips with" having committed the

crime, and that could be worked on in psychotherapy." *Id.*, p. 6306. He clarified on cross-

examination, "Yes, it's impossible to provide a rehabilitation plan related to the crime

when I just am not able to get enough data about her state of mind, et cetera, at the time

of the crime." *Id.*, p. 6317.

On recross examination, Dr. Worst clarified that, while he was not able to

determine Sarah's rehabilitative potential, he based his opinion that she could be

rehabilitated on "the data … collected from [his] face-to-face interview, her intelligence,

her ability to do abstract thinking, the fact that she's not psychotic … [or] belligerent." *Id.*

at 6320-21. Dr. Worst also stated: "Her past history prior to the crime looks like that of a

pretty darn normal girl. She was very positive about both of her parents in all of her

discussions with me. She did appear to have some good family background." *Id.*, p. 6321.

Judge Wood specifically asked Dr. Worst about Sarah's honesty and tendency to

manipulate facts; for example, she said that her parents' bedroom door was closed, but

both of her own experts say Sarah's and her parents' doors had to have been wide open,

given the blood spatter. *Id.* at 6306-07. Dr. Worst disagreed with Judge Wood's

suggestion and opined that he saw areas where she was not manipulative or evasive. He

provided examples of instances where Sarah was candid about other difficult topics, like

her sexuality and her relationship with Bruno. *Id.*, pp. 6306-6310.

**MEMORANDUM DECISION AND ORDER - 26**

Dr. Worst also noted that Sarah was relying on her lawyer's advice in not discussing the crime. *Id*., p. 6309. Judge Wood "recognized" and "honored" Sarah's "privilege" to remain silent under the Fifth Amendment, *see id*., pp. 6463-64, and assessed her character based on what she *did* say to others, as found in the record. For example, Judge Wood was very concerned that Sarah told family members that she did not commit the crime and said that "the true story would come out in the end," when, in the end, the evidence clearly pointed to herself as perpetrator. *Id*., pp. 6306-6314. The trial judge saw this type of dishonesty as an ingrained characteristic of Sarah's personality. Dr. Worst did not have an answer for this observation, and said it would be "psychiatric speculation" to try to do more without any data to support his answer. *Id*.

Dr. Beaver testified about the current scientific understanding of brain development. Those areas of the brain associated with high-level decision making, organization, problem solving, inhibitory control, and higher-level adult reasoning and functioning do not fully develop until sometime in the mid-twenties, when development is "pretty much complete." State's Lodging A-21, pp. 6370-71. After that, people "continue to learn, grow and develop" until death. *Id*. at 6372. Under this pattern, it would be unlikely that a 16-year-old's brain would be fully developed, he opined. *Id*. at 6373.

Dr. Beaver explained that, in sixteen-year-olds, problem-solving activity takes place in the mid-brain or posterior portion of the brain, while in the mid-twenties, problem-solving takes place in the frontal cortex. *Id*. at 6374. The progression allows

**MEMORANDUM DECISION AND ORDER - 27**

better problem-solving by improving the quality of reasoning in the following ways: "(1) [t]he ability to be more abstract, not be so immediate; (2) [t]o be more objective sometimes"; (3) [t]o weigh pluses and minuses more thoroughly"; and (4) to understand "the longer-term implications of what your actions may be, for example, instead of the immediate consequences." *Id.*, pp. 6375-76.

Dr. Beaver testified that he saw no instances of previous outbursts of violence in Sarah's history. *Id.*, p. 6391. Dr. Beaver testified that Sarah had "rehabilitation potential," even if she never admitted guilt, given the following: (1) in a study of 100 instances when a child killed a parent, the recidivism rates were zero; (2) Sarah did not have a mental health disorder; (3) she did not have a drug or alcohol dependency problem; (4) she was of average intelligence; and (5) she did not have a prior history of violence or criminal behavior. *Id.*, pp. 6396, 6399.

Judge Wood also questioned Dr. Beaver after cross-examination was completed. Dr. Beaver did not directly answer Judge Wood's question about whether the family members who testified against Sarah had unwarranted fear or might be in danger if Sarah were to be released from prison. *Id.*, pp. 6412-13. He said the only way he could answer that question was to rely on research, which shows that people who commit murder have one of the best track records for being successful once they return to society. *Id.*, p. 6413. As a matter of probability, after a twenty-five-year sentence (by about age 43), Sarah would not be a substantial risk to reoffend if released. *Id.*, pp. 6413-14.

**MEMORANDUM DECISION AND ORDER - 28**

Dr. Beaver also testified on cross-examination:

Q. (Mr. Thomas):      I'm asking you, if you're given two
                      competing interests, one protection of
                      society, versus rehabilitation of an
                      offender, obviously, the same person,
                      which do you find more compelling and
                      more important?

A.                    Well, fortunately, I'm not a judge and I
                      don't have to make those decisions. I
                      think both need to be weighed and
                      considered.

*Id.*, p. 6405.

Other testimony in the record reflected that Sarah generally exhibited mature

behaviors and decisionmaking: Sarah received good grades in school. She played on

sports teams. She was on the debate team. *See* State's Lodging A-22 (presentence

investigation report). Witness Patricia Adler testified that Sarah had asked Adler to

sponsor her so that she could be confirmed into the Catholic church. State's Lodging A-

21, p. 6423. "Sarah at 16 made that commitment to be confirmed into the church, which

took her going to classes, going to church every Sunday, making sure that she went to

every class. And not every 16-year-old will make that commitment, but she did." *Id.*

On June 30, 2005, after considering expert and lay witness testimony at the

sentencing hearing and entering an extensive explanation of the record, Judge Wood

sentenced Sarah to two concurrent fixed life terms, with a firearm enhancement of 15

years. *Id.*, pp. 6500-01.

**MEMORANDUM DECISION AND ORDER - 29**

After the United States Supreme Court changed the landscape of juvenile LWOP sentencing in June 2012, Sarah amended her April 2012 successive post-conviction petition in 2014 to challenge her LWOP sentences, among other claims. As noted above, Judge Bevan reviewed Judge Wood's sentencing proceedings and summarily dismissed the successive post-conviction petition in 2014. State's Lodgings G-1 to G-3.

Sarah appealed the denial of her successive post-conviction petition. In 2017, the Idaho Supreme Court rejected Sarah's argument that the state district court violated her Eighth Amendment rights by sentencing her "without adequate consideration of mitigation arguments based on youth and without a finding that she was irreparably corrupt." State's Lodging H-8, p. 17. The Idaho Supreme Court noted that two experts testified at the sentencing hearing about (1) the developmental state of an adolescent's brain compared to an adult; (2) how youth are more prone to impulsivity and more likely to be able to be rehabilitated; and (3) how Sarah herself could be rehabilitated.

The appellate court recognized that the sentencing court "explicitly noted that it had heard and considered the evidence presented on Johnson's youth" and then "spent considerable time discussing the reasons why it was imposing life without parole." *Id.* The Idaho Supreme Court gave examples of how the state district court referenced the testimony about Sarah's youth in its 42-page sentencing explanation, including: "'I also want to say to everyone here that I have heard what you have said. I have listened attentively'; 'I would also say to you that it's important to me, in this analysis, to consider the totality of all the facts and circumstances, and not any one piece in isolation'; 'I

**MEMORANDUM DECISION AND ORDER - 30**

recognize that some of the psychological evidence presented here at this sentencing hearing was to the effect that adolescents can act impulsively ...'; 'on the mitigating side, there is in fact your age'; [and] 'I don't think it's a product of your age.'" *Id.*

The Idaho Supreme Court specifically concluded that, "[a]lthough *Miller* and *Montgomery* had not been decided at the time of the sentencing hearing, and therefore the terms of 'irreparably corrupt' and 'transient immaturity' were not in the court's lexicon at that time, the court clearly considered Johnson's youth and all its attendant characteristics and determined, in light of the heinous nature of the crime, that Johnson, despite her youth, deserved life without parole." *Id.*, pp. 17-18. Therefore, the Idaho Supreme Court rejected Sarah's Eighth Amendment cruel and unusual punishment claim.

    **C.** *Discussion*

       i.   <u>Procedural Analysis</u>

This Court first reviews Sarah's argument that the state district court did not perform a proper Eighth Amendment procedural analysis before sentencing her. She argues that, because Judge Wood stated only that he "listened attentively" to the extended analyses of two mental health professionals who testified in Sarah's favor at the sentencing hearing, he did not perform the proper procedural analysis. However, as noted above, the holdings of *Miller* and *Montgomery* do not require a sentencing judge to make any particular findings or explain why testimony about youthful characteristics, either in general or in particular, was rejected.

**MEMORANDUM DECISION AND ORDER - 31**

Sarah is making the same argument made in *Jones*, that special words or findings are required, which has been rejected by the United States Supreme Court in three successive opinions. To make this point clear, the *Jones* Court explained that, if evidence of youthful characteristics was *presented* to the sentencing court, that necessarily means the sentencing court *considered* it in determining the youthful offender's sentence:

> First, and most fundamentally, an on-the-record sentencing explanation is not necessary to ensure that a sentencer considers a defendant's youth. Jones's argument to the contrary rests on the assumption that meaningful daylight exists between (i) a sentencer's discretion to consider youth, and (ii) the sentencer's actual consideration of youth. But if the sentencer has discretion to consider the defendant's youth, the sentencer necessarily will consider the defendant's youth, especially if defense counsel advances an argument based on the defendant's youth. Faced with a convicted murderer who was under 18 at the time of the offense and with defense arguments focused on the defendant's youth, it would be all but impossible for a sentencer to avoid considering that mitigating factor.
>
> It is true that one sentencer may weigh the defendant's youth differently than another sentencer or an appellate court would, given the mix of all the facts and circumstances in a specific case. Some sentencers may decide that a defendant's youth supports a sentence less than life without parole. Other sentencers presented with the same facts might decide that life without parole remains appropriate despite the defendant's youth. But the key point remains that, in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor.

141 S.Ct. at 1319-20.

**MEMORANDUM DECISION AND ORDER - 32**

The record here reflects that the minimal procedural requirements of *Miller* were met in the 2005 sentencing hearing. Sarah had an individualized evidentiary hearing, where experts provided general scientific information and data about the characteristics of youth mentioned in *Roper*, *Graham*, *Miller*, and *Montgomery*. The experts also testified about their particular evaluations of Sarah and her personal characteristics. Both experts opined that Sarah had a relatively high potential for rehabilitation. Some of their testimony, however, was not favorable to Sarah, and Dr. Beaver particularly deferred to the sentencing court on the issue of whether protection of society or rehabilitative potential was more important. The sentencing court acted out of discretion and not pursuant to a mandatory sentencing scheme. Therefore, the 2005 sentencing hearing satisfied the Eighth Amendment's procedural requirements.

      ii.   <u>Substantive Analysis</u>

This Court concludes that the substantive constitutional protections were met in the Idaho courts' review of Sarah's sentences. Judge Wood acted under a state sentencing scheme that did not require a mandatory LWOP sentence. Judge Wood's explanation made it clear that he considered and rejected the expert testimony as it related to Sarah's youth before exercising his discretion to impose a LWOP sentence. A trial court must consider the evidence of youth, but it need not accept it as a mitigating factor in any particular case, which is the definition of a "discretionary" decision. The *Miller* requirement is met when a sentencing transcript reflects that an evidentiary presentation

**MEMORANDUM DECISION AND ORDER - 33**

was made of how youth affects problem-solving and the particular youthful

characteristics of the juvenile defendant.

For example, in *Jessup v. Shinn*, 31 F.4th 1262 (9th Cir. 2022), Jessup was 17

when he committed murder for which he received a LWOP sentence. Jessup's sentencing

hearing consisted of the same type of evidence as in Sarah's case:

> At the sentencing hearing, the parties debated whether
> Petitioner warranted a sentence of life without the possibility
> of parole or a sentence of life with the possibility of parole
> after 25 years. Petitioner's lawyer presented testimony by a
> psychologist who emphasized Petitioner's age and age-related
> characteristics, including Petitioner's emotional age of 12 or
> 13. Petitioner's age was not a cursory or tangential issue. The
> psychologist has examined numerous young people, and his
> 24-page, single-spaced report contextualized his findings in
> comparison to other youthful offenders. The report described
> Petitioner as "immature" with "regard to impulse control."
> The psychologist explained why Petitioner was slow to
> mature and why he had "a functional social level of about 2/3
> [his] chronological age." It also was noted that, in general,
> "[t]he incidence of violence is highest in the age group 15–
> 24" and that Petitioner "can be no younger than 43 at [the]
> time of release." Addressing specifically the prospect for a
> young person's maturation, the report concluded [in part]:
>
> > A broadening of temporal awareness tends to
> > accompany advancement into adulthood, and
> > for this reason, I believe that [Petitioner's] risk
> > of violent offense will gradually diminish with
> > maturation – particularly after age 25.
> >
> > . . .
>
> After much deliberation and weighing of mitigating and
> aggravating factors as to the murder count, the judge
> sentenced Petitioner to natural life:

**MEMORANDUM DECISION AND ORDER - 34**

> So when my choice is between a chance that
> you will be paroled and certainty of knowing
> that you will be in prison for the rest of your
> life, the choice becomes clear to me. I really do
> believe that you forfeited your right to walk as a
> free member of society, again, because of the
> heinousness of the crimes and cruelty that you
> imposed on Mr. Watkins.

31 F.4th at 1264. On federal habeas corpus review, the district court denied Jessup relief.

The United States Court of Appeals for the Ninth Circuit affirmed denial of habeas corpus relief to Jessup, reasoning that "*Miller* addressed situations in which the sentencing authority imposed a sentence of life without parole automatically, with no individualized sentencing considerations whatsoever," but "given the sentencing judge's extensive deliberation here as to whether [Jessup] warranted a possibility of release, the state post-conviction court reasonably distinguished *Miller*." *Id.* at 1267.

Here, Sarah's argument is speculative. A review of the record shows that Judge Wood considered everything and rejected some evidence. Judge Wood introduced his sentencing decision by saying he took into consideration "the width and depth and breadth" of the record. State's Lodging A-21, pp. 6464-65. He was not required to say in which order he conducted his analysis: everything means everything. He particularly articulated that, although various witnesses invited him to pick out "different pieces of evidence and single facts" and "focus primarily on that," he wanted to be clear that his decision was based on "the totality of the whole thing." *Id.* at 6465. This introduction, together with the specific statements the Idaho Supreme Court singled out showing that

**MEMORANDUM DECISION AND ORDER - 35**

the sentencing judge considered all of the evidence in the record, including youthful characteristics and Sarah's youth in particular. *See* State's Lodging H-8.

Here, Sarah is attempting to press a requirement upon the sentencing court that simply is not found in *Miller* or *Montgomery*. She argues that Judge Wood did not consider youthful characteristics *before* considering the totality of evidence simply because he did not say so. In fact, Judge Wood did more than what the Eighth Amendment requires, as a presentation of expert evidence of youthful characteristics necessarily means the sentencing court considered it in determining the youthful offender's sentence. *See Jones*, 141 S.Ct. at 1319-20.

Sarah similarly takes issue with the fact that no one said that youthful differences counsel against LWOP. But, the two expert witnesses clearly explained how, in their opinions, youthful characteristics "counseled against" a LWOP sentence, though they did not use that exact phrase, nor did they need to. Nor was Judge Wood required to say the words "counseled against" or explain how he particularly considered the "youth counseling against LWOP" factor and why it rejected that mitigation factor in Sarah's case.

In his analysis of youthful characteristics, Judge Wood stated that "on the mitigating side, there is in fact your age. At the time you committed these crimes, you were 16 years of age." State's Lodging A-21, p. 6477. Age is a mitigating factor; it is not a disqualifier but factor. Different ages of juveniles may call for different considerations. Cognizant that the *Miller* defendants were only 14, the United States Supreme Court

**MEMORANDUM DECISION AND ORDER - 36**

condemned mandatory sentencing schemes where individual ages could not be considered: "Under these schemes, every juvenile will receive the same sentence as every other—the 17–year–old and the 14–year–old." 567 U.S. at 465, 476–77. Neither *Miller* nor *Jones* suggested or held that the age of adulthood is now considered the mid-twenties, but each simply reiterated that maturity for sentencing purposes is not to be determined as a matter of law, but upon the facts of each case.

Reviewing other characteristics related to youth, Judge Wood found no evidence in the record that Sarah committed her crimes as a result of family or peer pressure; rather, the evidence showed she concocted and carried out the plan by herself. It was clear from the evidence that her boyfriend, Bruno, had no knowledge of Sarah's plan and that he distanced himself from her when he found out what she had done. *See* Dkt. 30, p. 12.

Judge Wood noted that Sarah had no history of prior juvenile delinquency. State's Lodging A-21, p. 6475. He also found that Sarah had no history of mental illness or head injury, and there was no evidence of "any cognitive barrier that prevented her from understanding what she was doing." *Id*., p. 6471. Dr. Worst testified that the type of ongoing depression that Sarah had would not have led her to commit the crimes. State's Lodging A-21, pp. 6287-88.

Judge Wood considered Sarah's upbringing and home life, just as the *Miller* Court distinguished between "the child from a stable household and the child from a chaotic and abusive one." 567 U.S. at 476–77. In Sarah's case, Judge Wood distinguished

**MEMORANDUM DECISION AND ORDER - 37**

Sarah's home life from that of eight recent criminal defendants' sentencing hearings. The court noted: "probably six out of the eight … the common themes coming through those … are the defendant comes from a broken, divorced home; … dropped out of school …; [o]n methamphetamine and/or drugs, other heavy drugs at an early age; [u]sing alcohol at an early age; [v]irtually no parental or family support; and few, if any, material items." *Id*. at 6490.

Judge Wood then told Sarah:

> Your situation is in stark contrast to that. Your parents had jobs. You had stability. You lived in this community all your life. You were on your way to a good education. You were involved in school athletics. All of the evidence, including your statement, is your parents came to the - each, virtually each and every one of your events. In fact, you wrote in your PSI, if my memory serves me, something to the effect that your parents didn't have that great of a marriage, because they spent all their time supporting Matt and you.
>
> And so what I'm saying is that the – it's just the opposite of what we normally see with kids in trouble. I normally see with kids in trouble. That isn't the circumstance here. You had it all. You had a nice house, nice family, nice school, lots of support, a car, freedom. It's confusing. It really is.

*Id*. at 6491-92.

While the *Miller* Court found juveniles distinct from adults because of their "limited control over their own environment" and an inability to "extricate themselves from horrific, crime-producing scenes," 567 U.S. at 467, Judge Wood, in contrast, found that Sarah had many resources in her life:

**MEMORANDUM DECISION AND ORDER - 38**

> In the final analysis, Miss Johnson, you had lots of options. You had your godmother, you had neighbors, you had a brother, you had Mel Speegle, you had school teachers, you had schoolmates, you had Bruno, you had Bruno's family. You had a car. You had all kinds of ways to not go down this road.
>
> Yet, you elected the worst of all possible courses of conduct. And it's the most final, the most devastating, and the harshest option you chose when you had nearly complete freedom to choose any of the others.

State's Lodging A-21, pp. 6497-98.

In addition, there was no evidence of physical or sexual abuse in Sarah's home that might have precipitated the killings. *Id*. at 6468. Judge Wood stated that he found no "legitimate or rational provocation" in Sarah's relationship with her parents as mitigation. The record reflects that Sarah did not get along with her mother and said she hated her mother. There was evidence that Sarah was close to her father, but very angry with him over ending her relationship with Bruno.

Judge Wood also considered whether Sarah acted out of youthful impulsivity:

> "While I recognize that some of the psychological evidence presented here at this sentencing hearing was to the effect that adolescents can act impulsively, the evidence in this case is not impulsive evidence.

*Id*., p. 6473. Judge Wood pointed out that Sarah's scheme was well-planned:

> Three full days elapsed from the time of the confrontation at Bruno's to the date of the killings; she spent many hours in the guest house where the murder weapon, ammunition, and other weapons and ammunition were located.

**MEMORANDUM DECISION AND ORDER - 39**

*Id*. at 6479.

Judge Wood highlighted other evidence supporting the lack of impulsivity in

Sarah's crime:

> With respect to the preparation involved, the evidence here is
> that you located this high-powered rifle and bullets in the
> guest house. You took the scope off of the rifle.
>
> You retrieved a Latex glove from a first aid kit. You secured
> your mother's driving gloves from the Suburban. You
> planned the placement of the butcher knives which came from
> two different places in the kitchen. You had to bring the rifle
> and ammunition to the main house from the guest house,
> together with other firearms.
>
> You knew that Mel Speegle, because your parents and you
> had had dinner with Mel Speegle, you knew from the week
> before, the Thursday or so before that Mel Speegle was not
> going to be there at that guest house, wasn't going to return
> until Tuesday following Labor Day weekend.
>
> And you waited until the appropriate time, in your mind, your
> mother was asleep in the bed. The evidence is that this
> comforter or covers were pulled over her head. And you shot
> her in the head in the near darkness.

*Id*. at 6479-80.

In a similar case, *McGilberry v. State*, No. 2017-CT-00716-SCT, 292 So. 3d 199

(Miss. Jan. 23, 2020), the defendant was 17 when he murdered his family, using baseball

bats as weapons. The sentencing trial judge "considered evidence of McGilberry's

chronological age and immaturity but found his crime was not the result of childish

impetuosity." *Id*. at 209.

**MEMORANDUM DECISION AND ORDER - 40**

In Sarah's case, Judge Wood also considered Sarah's degree of planning as evidence of a well-developed dangerous character. Judge Wood observed: "There's also the degree of planning and preparation and execution that went into these crimes … [that] says volumes about your character." *Id*. at 6476.

Similarly, in *McGilberry*, the Court reasoned:

> [McGilberry] knew what would happen if all went according to plan, as evidenced by hiding the bats so he could walk through the house, his attempt to clean the scene and hide the weapons, and his kidnapping alibi. The court found these actions to be the product of entrenched personality traits and not immaturity.

292 So. 3d at 203–04.

In addition, the fact that the planning was for the purpose of accomplishing a particularly heinous crime also factored into Judge Wood's analysis of Sarah's ingrained dangerous character:

> I can only presume and assume that one who goes and procures a high-powered rifle, hunting rifle, and shoots one victim in the head, and then moves deliberately to another room and shoots the other victim, would have to contemplate that the conduct would result in significant harm.
>
> This is particularly true, given the amount of time that you had taken to prepare for this event, and the fact that you essentially ambushed these people. The first one was asleep in bed, and the second was essentially ambushed coming out of the shower.
>
> But again, the instrumentality used and the method in which it was used, you clearly had to contemplate that your conduct would cause great harm.

**MEMORANDUM DECISION AND ORDER - 41**

State's Lodging A-21, pp. 6471-72.

Likewise, the sentencing court in *McGilberry* distinguished the premeditated and planned murder of the McGilberry family from the facts in *Miller*:

> [T]he trial court considered the circumstances of the murders and McGilberry's participation. In stark contrast to *Miller*, the murders here were brutal and premeditated. In *Miller*, the Supreme Court emphasized that one of the juvenile offenders had been high on drugs and alcohol consumed with the adult victim and the other did not fire the fatal bullet or intend anyone's death. *Miller*, 567 U.S. at 478-79, 132 S.Ct. 2455. But McGilberry was the ringleader in both the murderous plot and its execution. He planned his crime a week ahead. And when his friend refused to help, he found a younger, more amenable accomplice. McGilberry had a plan to hide the murder weapons before and after the murders. He wore gloves. And he disposed of evidence on the way back to his house.
>
> Although, "[w]hen compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability," here, there was no doubt McGilberry's primary intent was to kill.

292 So. 3d at 203-04.

In his analysis, Judge Wood noted that Sarah's character by the age of 16 demonstrated the following:

> There is evidence supported by your family members here, as well, with respect to your character that you're not trying to truly seek rehabilitation. What you're trying to do is just get off.
>
> They testify, at least in my summary, that you view yourself as the center of the universe, sort of - so to speak, and you go to unimaginable extremes to get what you want. It's all about Sarah, and it's all about Sarah now.

**MEMORANDUM DECISION AND ORDER - 42**

State's Lodging A-21, pp. 6490. In addition, Judge Wood noted, "Linda Vavold did testify that you manipulate facts to suit your own needs. I think there's strong evidence to support that assertion." *Id*. at 6492.

Dr. Worst's diagnosis of dependent personality disorder and Dr. Beaver's description of how a person with that diagnosis functions also support Judge Wood's character analysis. Dr. Beaver testified that, especially if involved with the wrong influences and if her relationships were in jeopardy, Sarah would go along with anything that someone else suggested to keep her relationships intact. Here, the evidence showed that, even beyond the classic profile of a dependent personality, Sarah had the wherewithal to make and carry out such plans on her own when her romantic relationship with Bruno was threatened.

Judge Wood believed Sarah might use violence against her family or others if she was ever released from prison. Judge Wood stated: "The family members here have testified, in one form or another, that they are fearful of retribution if and when you get out of prison." *Id*., p. 6467. Judge Wood also noted that "Malinda Gonzales testified that you told her that you were going to beat up Bruno when you got out; and if he died in the process, quote, oh, well, end quote." *Id*., p. 6490.

Judge Wood noted that Sarah was a consistent liar—a major character flaw developed and exercised by a person only two years from society's first mark of adulthood. The record reflects that Sarah concocted many lies to protect herself, without

**MEMORANDUM DECISION AND ORDER - 43**

regard to how they harmed others. For example, she had tried to pass blame for the

murders on to Janet Sylten and Christopher Hill when there was no evidence of motive,

without regard to the damage such allegations might cause in their lives.

Judge Wood relied on Sarah's statements to other witnesses found throughout the

record to "provide [him] with really a [good] look into your mind at different points."

State's Lodging A-21, p. 6463. He observed:

> There's also significant evidence relative to your lack
> of truthfulness. Other ideas about your character is this nail
> tech lady who came and testified. She had no part of this. You
> went to see her well after these events. And you told that nail
> tech lady, who was a good witness … things such as your
> mother's a doctor, your dad owns the landscape company,
> you have a vacation home in California, you live next door to
> Bruce Willis, Bruno owns a restaurant.
>
> I think Dr. Worst is right in the sense that you have this
> distorted view of yourself and reality, and the truth escapes
> you, frankly. And I don't think it's a product of your age. I
> just think it's a product of your makeup that you find the fact
> of being truthful difficult to get ahold of.

*Id.*, p. 6489.

Judge Wood particularly questioned Dr. Worst about the dishonesty factor.

However, Dr. Worst's testimony offered little to aid the judge on this point. *Id.*, pp. 6306-

6310.

In the end, Judge Wood had to choose between immature characteristics that Sarah

might grow out of or consistent character flaws that he believed were a significant risk to

society. Judge Wood chose the latter. Even though it is not necessary, there is enough in

**MEMORANDUM DECISION AND ORDER - 44**

the record to equate Judge Wood's analysis and decisionmaking as to character with the concept of "permanent incorrigibility."

During his introduction, Judge Wood discussed four goals and objectives a court must take into consideration in crafting a sentence: protection of society (which is "first and foremost…beyond any doubt, the primary factor in formulating a sentence"), deterrence ("specific to [the defendant] and general to the community"), retribution, and rehabilitation. *Id.* at 6460. Nothing in *Miller*, *Montgomery*, or *Jones* counsels that a sentencing court is required to abandon these societal objectives of a criminal sentence simply because the defendant is a juvenile. Rather, the sentencing court considers whether or how they apply based on the youthful characteristics of the particular defendant and the facts of the particular crime.

As to protection of society, Judge Wood found and concluded: "Given your personality diagnosis of a dependent personality by Dr. Worst, the lack of provocation, lack of any real demonstrated remorse, denial in the face of overwhelming evidence to the contrary, to me all indicate that the likelihood of commission of another serious crime is in fact reasonably possible. It may well be probable." *Id.* at 6476. In his overall consideration of the evidence, Judge Wood determined: "The protection of society question … outweighs, in my view, the individual needs of the defendant." *Id.* at 6468. He continued, "And so in the final analysis in my mind, given no reasonable explanation for the contrary, I have to come down on the side of protection of society in this risk analysis…. [T]he risk to society outweighs your individual needs and wants." *Id.* at 6499.

**MEMORANDUM DECISION AND ORDER - 45**

Judge Wood also said: "I will find and will state, in my opinion, that general deterrence certainly has some effect in regard to this kind of case, the nature of these offenses." *Id.* at 6470. Judge Wood reasoned:

> As to general deterrence, this -- the community and people in this state have to understand, and the kids in this state have to understand … when they get grounded by their parents when they refuse to follow family rules, when the parents are simply trying to protect them from an improper, illegal relationship, kids can't just go kill parents. We would have absolute disarray in our society if that was sanctioned behavior.

*Id.*, pp. 6499-6500.

On habeas corpus review, Sarah argues that this comment by Judge Wood is inconsistent with *Miller*'s directives:

> Here the sentencing court did exactly what the Supreme Court cautioned against and forbade: it allowed the nature of the crime to overpower the mitigation arguments based on youth. The sentencing court determined that Sarah was more deserving of the harshest possible penalty because she was a child and because it found that children killing parents cannot be tolerated and social chaos might result from a lesser penalty. Had Sarah been an adult who killed her parents, the court would have, by its reasoning, given her a lesser sentence because adult children who kill their parents do not threaten the social fabric as seriously as juveniles who kill their parents do. This failure to properly consider Sarah's youth violated *Miller* and the Eighth Amendment.

Dkt. 35, p. 12.

While Sarah does not specifically reference *Montgomery*'s deterrence discussion, this Court begins its analysis there. The *Montgomery* Court mentioned in dicta that a

deterrence rationale does not support a LWOP sentence, "because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." 577 U.S. at 207-08. This statement can be traced back to *Atkins v. Virginia*, 536 U.S. 304 (2002), where the Supreme Court concluded that applying the deterrence principle to "mentally retarded offenders" would be ineffectual. It would not deter particular offenders from committing future crimes, because these offenders could not control their conduct based on such reasoning. Nor would it deter potential offenders who were not mentally retarded, since such a rule exempting only the mentally retarded from capital punishment would not apply to anyone else. *Id*. at 305. The *Atkins* reasoning, repeated in every juvenile case through *Montgomery*, is not a good fit for these particular circumstances, where Judge Wood wanted to warn the community that, when a child executes an elaborate plan to kill one's parents because the child disagrees with discipline, that plan will be met with harsh punishment, where appropriate. It is not necessarily true that Sarah's harsh sentence would have no deterrent effect on Idaho teenagers nearing legal adulthood who are generally mature, careful, and calculating.

As to particular deterrence for Sarah herself, Judge Wood said:

> [I]mprisonment will provide appropriate punishment and deterrent to you. All of the evidence supports this finding. There is no evidence to the contrary. Clearly, if you're incarcerated, you cannot hurt anyone else.

**MEMORANDUM DECISION AND ORDER - 47**

State's Lodging A-21, p. 6470. This reasoning goes hand-in-hand with Judge Wood's

protection-of-society analysis. Based on the relevant facts, Judge Wood determined that

Sarah was too great a risk to release from custody in the future.

Judge Wood implied that, in some instances, a child who kills a parent may have

had a credible defense. But, in Sarah's case, he found:

> Part of the notion here, to me at least, is that society cannot
> tolerate and will not tolerate a child rebelling against parents
> and killing them, the very people who in this circumstance
> were trying to protect you. And, *clearly, absent any*
> *justification or excuse*. That's precisely what happened here.

*Id.*, pp. 6469-70 (emphasis added). Judge Wood also stated that deterrence would not

have an effect if the deaths resulted from a crime of passion. *Id.*, p. 6470. But he did "find

and … state that general deterrence certainly has some effect in regard to this kind of

case, the nature of these offenses." *Id.*

The Court disagrees with Sarah's argument that Judge Wood's particular

discussion of deterrence of parricide is the equivalent of a pronouncement that he

disregarded the characteristics of youth in general and of Sarah in particular in crafting

her sentence. Judge Wood's deterrence discussion based upon the child-parent

relationship and how that might affect societal structure in the community is but one layer

of consideration that went into the sentencing analysis. As Dr. Beaver noted, the duty of a

sentencing court is to consider more than simply youthful characteristics and the

defendant's interests, but also to consider the effect of the sentence on the community.

*Id.*, p. 6405. Judge Wood carefully reviewed youthful characteristics and found Sarah to

**MEMORANDUM DECISION AND ORDER - 48**

be on the high-functioning side of youthful offenders and on the dangerous side of all
offenders.

Next, Sarah takes issue with Judge Wood's statement that:

> I think Dr. Worst is right in the sense that you have this
> distorted view of yourself and reality, and the truth escapes
> you, frankly. And I don't think it's a product of your age. I
> just think it's a product of your makeup that you find the fact
> of being truthful difficult to get a hold of.

*Id.*, p. 6489.

Sarah argues that this comment illustrates the court's lack of understanding
regarding the nature of youth. In her view, the court should not have considered Sarah's
"'nature' as if it were "an immutable and unchangeable quality." Sarah asserts that Eighth
Amendment juvenile offender cases require the sentencing court to take the opposite
view—it must consider that a child's character is not as well formed as an adult's
character, which means that Sarah's traits were less fixed and her actions less likely to be
evidence of irretrievable depravity, citing *Montgomery*. *See* 577 U.S. at 207.

This argument disregards *Montgomery*'s recognition that, in the rare instance
when a juvenile offender commits a crime that "reflect[s] permanent incorrigibility,"
LWOP *is* a constitutionally appropriate sentence. 577 U.S. at 209. That is, *Montgomery*
recognizes both that a child's nature or character may become immutable before
adulthood and that the child's particular crime can be an indicator of permanent
incorrigibility. Here, the sentencing court pointed to Sarah's characteristics of widespread
dishonesty and placing herself above others at any cost, her dependent personality

**MEMORANDUM DECISION AND ORDER - 49**

disorder that endangered the community, and the depth of the incredibly harmful planning and execution of the crimes as sufficient evidence that she was that rare juvenile who deserved a life sentence with no opportunity for parole.

Sarah also proposes additional procedural protections for Idaho's sentencing courts, desiring a requirement that a sentencing court follow a certain sequence in its analysis and articulate certain findings. She claims that, in every case, the sentencing court must first consider how children are different, as explained by the Supreme Court, and, second, consider how those differences counsel against a fixed life sentence in the manner established by the Supreme Court, and third, consider the totality of the evidence. Dkt. 35, p. 10. The Constitution does not demand articulation of these factors or consideration of them in any particular sequence (though the suggested sequence is logical). Regardless of the wisdom and desirability of such protections for youthful offenders, the Constitution requires little in this area because federal courts must avoid encroaching upon states' rights.[2]

---

[2] In *Jones*, the Court explained:

> Importantly, like *Miller* and *Montgomery*, our holding today does not preclude the States from imposing additional sentencing limits in cases involving defendants under 18 convicted of murder. States may categorically prohibit life without parole for all offenders under 18. Or States may require sentencers to make extra factual findings before sentencing an offender under 18 to life without parole. Or States may direct sentencers to formally explain on the record why a life-without-parole sentence is appropriate notwithstanding the defendant's youth. States may also establish rigorous proportionality or other substantive appellate review of life-without-parole sentences. All of those options, and others, remain available to the States. See generally J. Sutton, *51 Imperfect Solutions* (2018). Indeed, many States have recently adopted

**MEMORANDUM DECISION AND ORDER - 50**

Sarah also argues that Judge Wood's additional reasoning for her sentence, using a "credit and debit" analysis and analogizing to death penalty aggravating and mitigating factors, was constitutionally inappropriate. However, again, Judge Wood's conclusion, as a discretionary decision that considered evidence of youthful characteristics in general and in particular as to Sarah, fulfills the *Miller* requirement. There is no United States Supreme Court precedent dictating that Judge Wood's additional reasoning somehow nullifies presentation and consideration of evidence of youthful characteristics presented in the sentencing record. Here, this Court finds AEDPA precludes relief based on the argument that Sarah's sentences violate the substantive provisions of the Eighth Amendment.

iii.    ***Evidentiary Hearing Requests***

Sarah asserts that she requested an evidentiary hearing on successive post-conviction review to present additional evidence in support of her *Miller* claim, but Judge Bevan denied the request. Sarah now asserts that she is entitled to a federal court evidentiary hearing before this Court decides the merits of the Idaho Supreme Court's decision. She desires to present evidence of how she has matured during incarceration,

---

one or more of those reforms. *See, e.g.,* Brief for Former West Virginia Delegate John Ellem et al. as *Amici Curiae* in *Mathena* v. *Malvo,* —— U.S. ——, 139 S.Ct. 1317, 203 L.Ed.2d 563 (2019), O. T. 2019, No. 18–217, pp. 29–36. But the U. S. Constitution, as this Court's precedents have interpreted it, does not demand those particular policy approaches.

141 S. Ct. at 1323. Some states have codified additional protection for youth in what are termed "*Miller*-fix statutes." *See, e.g., State v. Haag*, 198 Wash. 2d 309, 322, 495 P.3d 241, 247–48 (Wash. Sept. 23, 2021).

**MEMORANDUM DECISION AND ORDER - 51**

made positive steps toward rehabilitation, and accumulated a good prison disciplinary record. Dkt. 35, pp. 30-31. *Montgomery* provides that post-conviction prison behavior records are "an example of one kind of evidence that prisoners might use to demonstrate rehabilitation." 577 U.S. at 213.

While Sarah is correct that the provision of the federal habeas corpus statute that generally prohibits evidentiary development in federal court—28 U.S.C. § 2254(e)(2)—does not apply here if her diligent effort to present evidence in state court was thwarted, that procedural posture alone does not automatically qualify a claim for an evidentiary hearing. The United States Court of Appeals for the Third Circuit explained: "[F]ederal courts have discretion to grant a hearing or not. In exercising that discretion, courts focus on whether a new evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claim." *Campbell v. Vaughn*, 209 F.3d 280, 287 (3rd Cir. 2000).

Importantly, Sarah was already afforded a discretionary hearing in state court during sentencing. In contrast, in *Miller* and *Montgomery*, the defendants were sentenced under a mandatory scheme, and, thus, a new hearing, where the sentencing court *is* permitted to consider youthful characteristics, was required. The underlying purpose of AEDPA—that federal courts may not undo state appellate court decisions unless those courts unreasonably apply United States Supreme Court precedent—governs here. *Miller* and *Montgomery* simply do not require that juveniles sentenced under discretionary sentencing schemes be permitted to bring forward post-conviction prison behavior and

**MEMORANDUM DECISION AND ORDER - 52**

rehabilitation evidence if they were afforded a sentencing hearing that comported with *Miller* in the first instance. Sarah's sentencing hearing before Judge Wood provided her with sufficient Eighth Amendment protections.

Further, this Court concludes that an evidentiary hearing to provide rehabilitation evidence is unnecessary to the adjudication of her claim. The deciding factor for the sentencing court was that Sarah had been diagnosed with dependent personality disorder, that she had acted in conformity with the traits associated with that disorder in a heinous and extreme manner, and that society must be protected from her. Judge Wood determined that protection of society was more important than taking a chance on whether Sarah could be rehabilitated.

Sarah's suggested new evidence does not address the factors that Judge Wood thought most important. Further, a showing that Sarah has gained additional traits of maturity does not show that she was so immature when the crime occurred that she deserved a lesser sentence. Rather, the record reflects that Sarah was sufficiently mature at the time she killed her parents to warrant a LWOP sentence.

      iv.   ***Conclusion***

To prevail on her Eighth Amendment LWOP claim, Sarah must show that the Idaho Supreme Court's rejection of this claim was contrary to, or an unreasonable application of, federal constitutional law based on United States Supreme Court precedent existing when the Idaho Supreme Court entered its order. The Idaho Supreme Court concluded that, although *Miller* and *Montgomery* had not been decided at the time

**MEMORANDUM DECISION AND ORDER - 53**

of the sentencing hearing, the trial court still "clearly considered Johnson's youth and all its attendant characteristics and determined, in light of the heinous nature of the crime, that Johnson, despite her youth, deserved life without parole." State's Lodging H-8, pp.17-18.

The decision of Idaho's highest state court was not contrary to, or an unreasonable application of, *Miller* and *Montgomery*. The Idaho Supreme Court's conclusion that the sentence does not violate the Eighth Amendment is grounded in the following reasons: Sarah had an individualized hearing where a LWOP sentence was not mandatory; a psychiatrist and neuropsychologist presented extensive evidence of the differences between youthful brains and mature brains and gave their opinions as to Sarah's youthful characteristics and potential for rehabilitation; the judge explained that he listened attentively to the evidence; and the judge considered how youthful characteristics of a juvenile offender can counsel against a fixed life sentence; but, in the end, the judge exercised his discretion to decide that, under Sarah's particular circumstances, a LWOP sentence was warranted. In her federal Petition, Sarah requests procedural protections not required by *Miller*, a result that is not available to her under AEDPA.

*Montgomery* recognized that, in the rare instance when a juvenile offender commits a crime that "reflect[s] permanent incorrigibility," LWOP is a constitutionally appropriate sentence (though, importantly, that is not the holding of that case). 577 U.S. at 209. Here, Judge Wood made a determination that this case *is* that rare instance where LWOP is warranted. Judge Wood carefully contemplated the nature of the crimes and the

**MEMORANDUM DECISION AND ORDER - 54**

type of character it took to carry through with them. For example, Judge Wood said that

once Sarah pulled the trigger on her mother,

> [l]iterally, at that point, devastation occurred. The evidence in this case is that body parts flew all over. And one of the things that I thought about in this case from forever is this notion that for whatever reason you could get far enough off center, far enough off the bubble, disturbed enough, whatever the right word is, to pull the first trigger; then this devastation occurred.
>
> I mean the shot in that house had to be near deafening. The neighbors heard it. So inside the confines of that house, it had to be just almost deafening.
>
> You add the report of the rifle, the recoil of the rifle, the explosion of your mother's head, and the lights didn't come on. And the irony of that -

*Id.*, p. 6481.

> But the purpose of going through this is the amount of time that elapsed. You had a chance to abandon, bail out of, stop this senselessness numbers of times. Presumably, you and your father had conversation, there was some communication. It's undeniable that you had to look him in the eyes when you shot him, and you shot him in the lungs. He had no chance to survive.
>
> And when I talk about the instrumentality used, the choice of weapon is a high-powered rifle used to kill big game, and it's like the choice is intentional to make sure that we get this job done.

*Id.*, p. 6483.

> Following the shooting, you proceeded and carried on still with your plan. The evidence is that you placed knives in Matt's room on the bed. You placed knives at the foot of your parents' bed on the floor. You attempted to destroy and lose

**MEMORANDUM DECISION AND ORDER - 55**

> evidence, get rid of the bathrobe, the gloves. Those are found
> out in the trash can.

*Id*., p. 6484-85.

To show that this juvenile case stands out from others, Judge Wood made various

statements such as:

- "As to Dr. Beaver's testimony about children, what I would respond is children normally don't act the way you act. You had many options to do many different things, and you chose to do what you did." *Id*., p. 6492.

- "[T]here are murders, and then there are murders, if you will." *Id*., p. 6487-88.

- "[U]nder all of the circumstances, I would find that this is in fact an extreme and aggravating case." *Id*., pp. 6499-6500.

The United States Supreme Court has not retreated from its statement in *Roper*,

*Graham*, and *Miller* that the *nature of the crime* could reflect the *nature of the individual*,

warranting a LWOP sentence, *see* 435 U.S. at 573, 560 U.S. at 68, and 567 U.S. at 479-

80 (there exists the "rare juvenile offender whose crime reflects irreparable corruption"),

or from its statement in *Montgomery* that "life without parole *could be a proportionate*

*sentence*" for "those rare children whose crimes reflect irreparable corruption." 577 U.S.

at 734 (emphasis added). Here, the sentencing court exercised its discretion to deem

Sarah's case one of those rare circumstances, and the Idaho Supreme Court reasonably

upheld that determination. That another jurist might have agreed with the expert

witnesses and pronounced a different sentence, or overturned the sentence, does not

warrant habeas corpus relief. *See Richter*, 562 U.S. at 101. The Idaho Supreme Court's

**MEMORANDUM DECISION AND ORDER - 56**

decision to affirm the sentences under the Eighth Amendment is not contrary to the holdings of *Roper*, *Graham*, *Miller*, or *Montgomery*, nor is it based on an unreasonable determination of the facts. Therefore, no relief is warranted on this claim.

## DISCUSSION OF CLAIMS CONDITIONALLY DISMISSED: THREE, FOUR and FIVE

### 1. Standard of Law

Claims Three, Four, and Five are procedurally defaulted Sixth Amendment ineffective assistance of trial counsel claims. The Court can hear the merits of these *Strickland* claims if Petitioner meets the *Martinez v. Ryan* exception, which incorporates elements of the *Strickland* standard.

The *Martinez* cause and prejudice test consists of four necessary prongs: (1) the underlying ineffective assistance of trial counsel (IATC) claim must be "substantial"; (2) the procedural default must have been caused by PCR counsel's *Strickland* ineffectiveness or the lack of counsel during post-conviction review; (3) the post-conviction proceeding was the "initial" collateral review proceeding where the IATC claim could have been brought; and (4) state law or its practical procedures required that the IATC claim be raised in the initial post-conviction proceeding, rather than on direct appeal (as is the case in Idaho). *See Trevino v. Thaler*, 569 U.S. 416, 423, 429 (2013). The failure to meet any prong means that the *Martinez* exception is unavailable to excuse the procedural default of a claim.

**MEMORANDUM DECISION AND ORDER - 57**

Federal courts are not required to address a procedural issue before deciding *against* the petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518 (1997); *cf. Franklin v. Johnson*, 290 F.3d 1223 (9th Cir. 2002) ("appeals courts are empowered to, and in some cases should, reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar"). In its previous Order, the Court ordered the parties to brief the merits of those claims for which a *Martinez* argument was made. The parties have done so.

### 2.   Claims 3(A) through (C) are Procedurally Defaulted

In its Order of September 18, 2019, the Court concluded that Claims Three (A) through (C) were procedurally defaulted in federal court for two reasons: primarily, for failure to raise the claims in the first post-conviction petition, contrary to the Idaho statute governing post-conviction actions; and, secondarily, for withdrawal of the claims without giving the Idaho Supreme Court an opportunity to address them.

### 3.   Claim 3(A): Intentional Destruction of Evidence

Sarah asserts that trial counsel acted ineffectively in failing to file a motion to dismiss under *Arizona v. Youngblood*, 488 U.S. 51 (1988), because the State discarded the comforter covering her mother's body instead of keeping it for evidence. In *Youngblood*, the Court held that, "unless a criminal defendant can show bad faith on the

part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58.[3]

Sarah has not shown that the failure to preserve the comforter was the result of bad faith. A massive amount of evidence was collected during the investigation, including over 1600 fingerprints. Besides the comforter, other items from the room were not collected, such as the telephone, Kleenex box, or lamp—all of which had blood spatter on them. Investigators took photographs of the comforter and testified at trial about the condition of the comforter when they saw it shortly after the shootings.

After reviewing the state court record and the parties' briefing, the Court concludes that there is no evidence of bad faith destruction of evidence. Accordingly, Petitioner has failed to show that her trial counsel performed deficiently in not filing a *Youngblood* motion or that prejudice resulted from that omission. As a result, post-conviction counsel was not ineffective in omitting this claim. Therefore, Claim 3(A) fails both on the prejudice prong of *Martinez* and on the merits.

### 4.  Claim 3(B): Parole Status of Janet Sylten, the "Cleaning Lady"

The next procedurally defaulted claim centers on the feeble defense that Janet Sylten ("Janet"), who worked for a cleaning company hired to perform a one-time cleaning of the Johnson house, was the person who killed Sarah's parents. Sarah contends that her trial counsel should have presented evidence that Janet was on parole for

---

[3] Such "potentially useful information" is to be distinguished from "material exculpatory evidence" addressed in *Brady v. Maryland*, 373 U.S. 83 (1953). *Illinois v. Fisher*, 540 U.S. 544, 548 (2004).

**MEMORANDUM DECISION AND ORDER - 59**

aggravated battery of a police officer, which would have shown that she had a motive to kill the Johnsons.

Janet's interaction with the Johnsons was minimal. As a surprise thank you gift to Sarah's mother Diane ("Diane") for hosting a family wedding, a relative hired Whirlwind Services to do a one-time post-wedding house cleaning. State's Lodging A-18, pp. 3758-60. Robin Lehat ("Robin"), who owned Whirlwind, and Janet, her employee, cleaned Diane's house. After the cleaning, Diane called Robin and said a new bottle of Estee Lauder lotion was missing. *Id.*, p. 3762. Robin then asked Janet about the lotion, because Robin noticed that Janet had several Estee Lauder products. Janet denied taking the lotion and refused to return to Diane's house to help Robin look for the lotion. *Id.*, p. 3763.

Robin and Diane spoke again and decided that Robin would make up for the lost lotion by giving Diane a cleaning credit for the future. *Id.*, pp. 3761-64. Robin testified that Diane had been "really nice" about the whole thing. *Id.*, p. 3764. Several witnesses testified that Diane had discussed the missing lotion incident with them, had not seemed angry about it, had not said she was going to call the police, and had seemed quite pleased with the resulting compromise that she would receive a discounted cleaning in the future. State's Lodging A-18, pp. 3761 to 3764.

Janet lived on Robin's property. Janet testified that her current boyfriend, Russ Nuxoll ("Russ"), was Robin's ex-boyfriend. Not surprisingly, Robin and Janet had been having problems with each other before the lotion incident. Janet testified that she had refused to go to Diane's house to look for the lotion because she already had planned to

**MEMORANDUM DECISION AND ORDER - 60**

help Russ with his hand-made willow furniture manufacturing business that day. While Janet was at Russ's, Robin put all of Janet's belongings outside and left her a note that she was fired. State's Lodging A-16, p. 232. Janet testified that she was not really upset over being fired from Whirlwind, because she preferred working at her other job building furniture with Russ. *Id.*, p. 2814.

After Robin and Janet parted ways, Robin changed the locks on her home. Robin testified that Janet and Russ broke in and took some of her belongings, including a gift that Russ had given to Robin when the two had dated in the past. State's Lodging A-18, pp. 3777-79.

After the murders of Sarah's parents, Robin, Janet, and Russ all cooperated with investigators and provided DNA and fingerprint samples. When Blaine County Sheriff's Captain Edward Fuller ("Captain Fuller") interviewed Janet and Russ the first time, they were somewhat reluctant to speak, not knowing why they were being interviewed. Nothing they said or did during the interview indicated that they had any awareness that the Johnsons had been killed. Between interviews, Janet and Russ read the newspaper and learned that the Johnsons had been murdered; Janet and Russ freely spoke to Captain Fuller after they were aware that was the reason they were being interviewed. Janet and Russ had no clear alibis—they camped out in a wilderness area instead of having a permanent residence. Janet allowed Captain Fuller to search her belongings. State's Lodging A-17, pp. 2886-2910. None of the DNA or fingerprints from the crime scene matched Robin, Janet, or Russ, and they all were cleared as suspects.

**MEMORANDUM DECISION AND ORDER - 61**

Mr. Pangburn did not present evidence that Janet was on parole at the time of the murders. However, that fact was placed before the jury by the prosecution's witness. Captain Fuller testified that Janet "was initially concerned about talking to us, based on being on parole. But she was freely talking to us about – about where she was." State's Lodging A-17, p. 2889. Captain Fuller also mentioned Janet's parole status a second time during his testimony. *Id*., pp. 2895-96.

This claim fails on the merits for lack of a showing of prejudice or deficient performance by Mr. Pangburn. No prejudice resulted, because the jury was informed of Janet's parole status. This alternative perpetrator defense was too weak to be taken seriously, even if counsel would have highlighted Janet's parole status. A jump from a mere accusation that Janet stole a bottle of lotion from Diane to a conclusion that Janet chose to murder not one, but two people, to save herself from being charged with stealing the bottle of lotion, is simply implausible.

It is nearly impossible to conjure up a scenario in which Janet, who had been to the Johnsons' house once, could have obtained the weapon from the over-garage apartment, the knives from several areas of the kitchen, Sarah's robe from her room, and Diane's leather gloves from her car, let alone could have carried out two murders with a high-powered rifle without being discovered. The Court agrees with Respondent that "[i]t is preposterous to suggest that the jury would have instead acquitted Johnson of the murders had they only known that [Janet] Sylten, in addition to having been accused of theft at the Johnsons' residence, was also on parole at the time of the murders. Sylten was

**MEMORANDUM DECISION AND ORDER - 62**

not a viable alternative murder suspect." Dkt. 33, p. 36. This claim fails both on the

prejudice prong of *Martinez* and on the merits—neither trial counsel nor post-conviction

counsel was ineffective.

### 5. Claim 3(C): Failure to Object to Prosecutorial Misconduct

Sarah asserts that her trial counsel failed to object to prosecutorial misconduct

throughout the trial. The standard for a claim of prosecutorial misconduct on habeas

review is a "narrow one of due process, and not the broad exercise of supervisory

power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.

DeChristoforo*, 416 U.S. 637, 642 (1974)). A prosecutor's comments or actions that may

be considered inappropriate under the rules of fair advocacy, or even reversible error on

direct review, will not warrant federal habeas relief unless the alleged misconduct "so

infected the trial with unfairness as to make the resulting conviction a denial of due

process." *Donnelly*, 416 U.S. at 643.

i.  <u>Allegation that the prosecutor told the state's witnesses they could not talk to
    the defense without the prosecutor or his agent being present</u>

Sarah asserts that the prosecuting attorney committed misconduct when he "told

all state officials involved in the case that they could not talk to the defense without him

or his agent present." Dkt. 8-1 p. 17. Even if the prosecutor did so, Sarah has not come

forward with any evidence or argument showing that her defense was prejudiced as a

result of a failure to object. Therefore, this claim fails both on the prejudice prong of

*Martinez* and on the merits—neither trial counsel nor post-conviction counsel was ineffective.

      ii.    <u>Allegation that the prosecutor improperly invoked the sympathy of the jury in the opening statement</u>

Sarah alleges that the prosecutor improperly invoked the sympathy of the jury in his opening statement. The purpose of an opening statement is "to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole." *Arizona v. Washington*, 434 U.S. 497, 513 n. 32 (1978). "Arguments that encourage juror identification with crime victims are improper." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008). A prosecutor acts improperly when he "calls on the jury's emotions and fears—rather than the evidence—to decide the case." *Id*.

The United States Court of Appeals for the Sixth Circuit has observed: "The Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'" *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S.at 645). In all instances of asserted prosecutorial misconduct, to warrant habeas corpus relief, the petitioner must show that the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.

In Sarah's case, the prosecutor's opening statement began as follows:

**MEMORANDUM DECISION AND ORDER - 64**

> Although this case states that it's state of Idaho versus Sarah
> Marie Johnson, this case is a lot about a whole lot more. It's
> about these two people, Alan and Diane Johnson. Hard-
> working, honest, good, decent people, whose murder left a
> grieving son, a brother, sisters, parents, and a host of good
> friends. This case, ladies and gentlemen, is not about an
> unknown killer. This case is about evidence left behind; left
> behind by that lady that sits right there at that table, Sarah
> Marie Johnson.

State's Lodging A-15, pp. 1471-1472.

Sarah's assertion that "[t]his argument was misconduct because it played upon the sympathies of the jury" has some basis in fact, but her assertion that these words "urged them to return a verdict based on information other than the properly admitted relevant evidence" is unsupportable. The statement included no "urging" and was followed by 29 transcript pages of the details of the evidence against Sarah that the prosecutor outlined would be presented at trial. *See* Dkt. 8-1, p. 17; State's Lodging A-15, pp. 1473-1502.

While Mr. Pangburn could have objected that the prosecutor's opening statements about the victims were intended to invoke the sympathy of the jury, a comparison to other cases shows that the comments were not egregious; thus, no prejudice resulted from the failure to object. In *Brown v. Sirmons*, 415 F. Supp. 2d 1268, 1296 (N.D. Okla. 2006), *aff'd*, 515 F.3d 1072 (10th Cir. 2008), the prosecutor opened by stating that the "victim had hopes and dreams." *Id.* at 1296. The federal habeas court held that, even if the statement was in error and an attempt to invoke sympathy, it simply did not rise to the level required to constitute a violation of Brown's due process rights. *Id.*

**MEMORANDUM DECISION AND ORDER - 65**

In *Studer v. Booker*, No. 09-14434, 2013 WL 425819 (E.D. Mich. Jan. 24, 2013), during the opening statement the prosecutor said that "the family was in turmoil, the children were without a mother or relatives, and the defendant was satisfying the grievances in his marriage" by killing the victims. *Id.* at *12. Studer argued that the prosecutor impermissibly appealed to the jurors' sympathy and made an improper "civic duty" argument. On appeal, the state appellate court agreed that "[a]n appeal to the jury to sympathize with a victim may constitute an improper argument," but concluded that "the prosecutor did not urge the jurors to convict defendant as part of its civic duty," and, thus, "[a]t worst, the prosecutor merely stated the obvious regarding the family's situation as a result of the killings and presented an argument as to defendant's motive that was consistent with the evidence presented." *Id.* The federal habeas court agreed that the prosecutor's references to the victim and her children during opening statement and throughout the case may have evoked sympathy, but found that (1) the prosecutor did not ask the jury to convict on that basis; (2) the prosecutor did not make an improper appeal to emotions or civic duty; and (3) the remarks were not so flagrant so as to render the petitioner's trial unfair. *Id.*

In another similar instance, a petitioner alleged her attorney was ineffective for failing to object to comments made by the prosecutor during opening statement regarding the victim's mother losing a son and his two children losing their father. *Timmons v. Aldridge*, No. CIV-17-86-R, 2017 WL 2616146, at *8 (W.D. Okla. May 24, 2017), *report and recommendation adopted*, No. CIV-17-86-R, 2017 WL 2609088 (W.D. Okla. June

**MEMORANDUM DECISION AND ORDER - 66**

15, 2017). In *Timmons*, the petitioner argued that these comments improperly elicited sympathy from the jury. The court concluded that the petitioner failed to show how she was prejudiced by these comments because it was "undisputed that Mr. Lane died and indeed left his mother without a son and his children without a father." 2017 WL 2616146, at *8.

In *Taylor v. Martin*, No. CIV-16-462-RAW-KEW, 2020 WL 1189932 (E.D. Okla. Mar. 12, 2020), the court concluded that the prosecutor's reference to the victim as "a small, timid 7-year-old girl" did not, in itself, invoke sympathy," because it was a factual statement. *Id.* at *13. Further, the court reasoned, "the prosecutorial comments made during closing, even if improper, when weighed against the strength of the evidence against the defendant, did not result in a fundamentally unfair proceeding." *Id.*

As to the prosecutorial comments in Sarah's case, this Court concludes that trial counsel did not perform deficiently in failing to object to the prosecutor's opening statement—given the considerable leeway counsel has in deciding whether to object to opening statements. The comments by the prosecutor were not egregious, lengthy, or inconsistent with the evidence. Neither did the prosecutor ask the jury to convict the defendant based on the victims' character or the family's loss, rather than on the evidence presented at trial.

The Court agrees with Respondent that, because the brief comments by the prosecutor preceded a 27-day jury trial, no prejudice occurred, because it is unlikely that the comments carried any weight in comparison to the overwhelming evidence pointing

MEMORANDUM DECISION AND ORDER - 67

to Sarah as the perpetrator. *See United States v. Williams–Davis*, 90 F.3d 490, 508

(D.C.Cir. 1996) ("the length of time between the prosecutor's opening statement and jury

deliberations… makes it unlikely that specific allegations in the opening profoundly

influenced those deliberations").

 Finally, the jury was instructed that the opening statements were not evidence.

State's Lodging A-21, pp. 6083- 6084. It must be presumed that the jury followed this

instruction. *Weeks v. Angelone*, 528 U.S. 225, 226 (2000). This claim fails both on the

prejudice prong of *Martinez* and on the merits. Neither trial counsel nor post-conviction

counsel was ineffective.

 iii. <u>Allegation that prosecutor suggested Sarah was required to disprove that she
killed her parents</u>

 Sarah claims that, "[i]n closing argument, the State committed misconduct by

shifting the burden of proof," because the "argument was based, in part, on the theme that

the defense had not proven that someone besides Sarah had committed the murders." Dkt.

8-1, p. 17. *Strickland* governs this claim. There is no specific precedent from the United

States Supreme Court providing a standard for when a lawyer must object to a

prosecutor's closing argument. Because many lawyers refrain from objecting during

opening statement and closing argument, the failure to object is within the "wide range"

of permissible professional legal conduct, unless the prosecutor makes "egregious

misstatements." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993), *as*

**MEMORANDUM DECISION AND ORDER - 68**

*amended on denial of reh'g* (Apr. 15, 1993); *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (internal quotation marks omitted).

Underlying the *Strickland* standard of law as to this claim is the substantive due process principle that a prosecutor may not tell the jury that the defendant has the burden to prove her innocence. *In re Winship,* 397 U.S. 358 (1970), declared that the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* at 364. In *Patterson v. New York*, 432 U.S. 197 (1977), the Court held that *Winship* was not transgressed where state law requires the prosecution to prove beyond a reasonable doubt each of the elements of murder, but places the burden of proving an affirmative defense on the defendant.

The United States Court of Appeals for the Ninth Circuit has observed that prosecutors have "considerable leeway" in closing argument to strike "hard blows." *United States v. Wilkes*, 662 F.3d 524, 538 (9th Cir. 2011) (internal citation and quotation marks omitted). Prosecutors are permitted to argue reasonable inferences based on the record before the jury. *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000). Importantly, "comments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof to the defendant where the prosecutor does not argue that a defendant's failure to explain them adequately requires a guilty verdict" and where the prosecutor "reiterates that the burden of proof is on the government." *United States v.*

**MEMORANDUM DECISION AND ORDER - 69**

*Vaandering*, 50 F.3d 696, 701-702 (9th Cir. 1995) (citations and internal quotations omitted).

In *United States v. Tucker*, 641 F.3d 1110 (9th Cir. 2011), the Ninth Circuit illustrated this principle:

> The record shows that the prosecutor's comments about what the jury "must find" were made in the context of explaining why the jury should reject Tucker's version of events, and only after the prosecutor already had said that the government was required to prove beyond a reasonable doubt that Tucker was guilty of possession of a firearm. In addition, the prosecutor reiterated on several occasions that the government had the burden of proof. We further agree with the district court that the prosecutor's comments were only argument, and note that the district court correctly instructed the jury on the proper standard. While the prosecutor's phrasing was inartful, his meaning is evident from context: to believe the defendant's account, the jury would have to believe implausible aspects of his testimony. This sort of argumentation is permissible. *See Vaandering*, 50 F.3d at 701–02. Accordingly, the prosecutor's comments did not constitute misconduct, and the district court did not err by allowing them. Furthermore, even if the comments were improper, the court's statements and instructions to the jury neutralized any potential prejudice.

*Id*. at 1122.

Here, Sarah asserts that the prosecutor "shifted the burden of proof," because, in closing argument, the State did not focus on how it proved its case, but focused on how Sarah alleged, but did not show, that an alternative perpetrator had committed the murders. Dkt. 19, pp. 39-40 (citing State's Lodging A-11, pp. 175-218).

**MEMORANDUM DECISION AND ORDER - 70**

However, near the start of his closing argument, Mr. Thomas, in fact, highlighted that Sarah did not have the burden of proof for anything:

> "Let's look at what we have got here. The defense, although they do not have the prove anything, they do not have to prove their innocence, what have they said?
>
> They have attacked our investigation as incomplete. They say the state bungled the criminal investigation. But what do we have?

State's Lodging A-11, p. 176. The prosecutor next discussed Sarah's defense and how it did not add up because of the strong evidence supporting her guilt. The prosecutor rebutted Sarah's attempt to implicate two other individuals as perpetrators. The prosecutor did not state or imply that the jury was required to convict unless Sarah proved that someone else committed the murders. *See id*., pp. 175-218.

The jury was properly instructed that the lawyers' arguments were not evidence. The jury was instructed that the State bore the burden to prove every element of the charged crimes against Sarah beyond a reasonable doubt. State's Lodging A-21, pp. 6085-6086. It must presumed that the jury followed these instructions. *Weeks*, 528 U.S. at 2346.

The prosecutor stated that Sarah did not have the burden to prove *anything*. Circuit case law interpreting broad United States Supreme Court due process principles permits the prosecutor to point to inconsistencies and weaknesses in the defense's theory and evidence. Because Mr. Pangburn had broad discretion in whether to make objections, especially during the prosecutor's closing argument, and because the closing argument

**MEMORANDUM DECISION AND ORDER - 71**

did not clearly suggest that Sarah had the burden to prove her innocence or prove that

another perpetrator was at fault, the Court concludes that Mr. Pangburn did not perform

deficiently in failing to object.

Further, the jury instructions neutralized any inference that Sarah had to prove

anything. In addition, Sarah has not demonstrated that an objection to any portion of the

prosecutor's argument would have resulted in a different trial verdict in light of the

overwhelming evidence of Sarah's guilt presented by the State at the trial. *See* Dkt. 30,

pp. 3-26, 55-63. The State proved its case during trial with ample evidence. Therefore,

Sarah has failed to show prejudice resulting from the lack of objection. Accordingly, this

subclaim fails on the *Martinez* prejudice prong and on the merits.

### 6. Claim 3(D) Jury's Trip to Crime Scene

Sarah asserts that trial counsel failed to object to the jury's trip from Ada County

to Bellevue to view the Johnson house (after it had been cleaned of the aftermath of the

shootings). Idaho law grants Idaho trial courts the authority to permit trial juries to view

the scene of a crime:

> When, in the opinion of the court, it is proper that the
> jury should view the place in which the offense is charged to
> have been committed, or in which any other material fact
> occurred, it may order the jury to be conducted in a body, in
> the custody of the sheriff, to the place, which must be shown
> to them by a person appointed by the court for that purpose;
> and the sheriff must be sworn to suffer no person to speak or
> communicate with the jury, nor to do so himself, on any
> subject connected with the trial, and to return them into court
> without unnecessary delay, or at a specified time.

**MEMORANDUM DECISION AND ORDER - 72**

I.C. § 19-2124.

Prior to the jury's visit to the Johnson house, the parties met with Judge Wood to determine the protocol for the visit, including instructions for the jury. State's Lodging A-16, pp. 2158-2167. Jurors were to be given a diagram of the property, and nothing else. *Id*. The attorneys agreed to meet on site beforehand to go through the house. *Id*., p. 2159. Mr. Pangburn indicated that he had no real concerns that there would be problems with onlookers, because it would be "midday in a fairly small neighborhood," and Mr. Thomas said Detective Harkins would have a law enforcement officer park at the end of the block to "keep the curious away." *Id*., p. 2162.

The court instructed the jury:

> No evidence will be presented at the scene. You will be provided with a couple of different schematics of the scene so you can correlate the scene to the schematic.

> Your observations during this view of the place involved are not evidence in this case, and you are not to take such observations into consideration in arriving at your verdict. The view is only for the purpose of assisting you in understanding the evidence presented in court.

State's Lodging A-16, p. 2362.

Sarah argues that the viewing and instruction were improper because the viewing was not evidence and information from the viewing could not be used in deliberations. However, the Idaho Supreme Court previously determined that a viewing is for exactly the purpose for which Judge Wood instructed the jury. That is, "[t]he purpose of the statute is not to permit the taking of evidence out of court, but simply to permit the jury to

**MEMORANDUM DECISION AND ORDER - 73**

view the place where the transaction is shown to have occurred, in order that they may the better understand the evidence which has been introduced*." State v. Main*, 37 Idaho 449, 216 P. 731, 734 (Idaho 1923).

Sarah has not shown that the visit was inappropriate for the purpose for which the jury was instructed. For example, a contested issue at trial was whether Sarah's parents' bedroom door was open or closed when they were shot, but blood and brain matter was found spattered across the hall and into Sarah's room. Another issue involved evidence that the shooter collected the gun from the garage apartment, the gloves from Diane's car, the knives from the kitchen, and then placed the knives in the various bedrooms. Accordingly, an understanding of the configuration of the house would have been helpful to the jury to understand all of this evidence; the house configuration would not easily be confused as "evidence"; and understanding the configuration would not be prejudicial to Sarah.

Sarah asserts that the visit was highly prejudicial and that she was deprived of the right to be present during the viewing. Dkt. 8-1, pp. 18-19. However, she provides no particular facts or argument showing any undue prejudice that occurred from the viewing or the lack of her presence. Further, even though the prosecutor argued that Sarah should not attend because her presence would be "prejudicial," he did not identify any particular prejudice, and Sarah's attempt to rely on this statement to argue prejudice to the defense is unsupported.

**MEMORANDUM DECISION AND ORDER - 74**

Sarah argues that Mr. Pangburn should not have waived her presence at the site visit. During in camera discussions, he indicated he did not intend to request that Sarah be transported to the site. State's Lodging A-15, pp. 1920-21. Respondent argues that Sarah was present in court the day before the jury viewing, while the logistics of the viewing were being discussed and that she personally expressed her agreement with the plan. The record reflects that this is true.

| | |
|---|---|
| Mr. Pangburn: | We are going to waive Miss Johnson's appearance for this little hearing in the morning. And that way – I just wanted to let the transport officer know, so he won't have to bother bringing her over here for that. |
| | And she's not going to be in attendance up there, so there's just no reason to bring her over in the morning. |
| The Court: | Is that agreeable to you, Miss Johnson? |
| Ms. Johnson: | Yes, it is, Your Honor. |

State's Lodging A-16, p. 2158, 2164-2165.

In summary, Sarah personally waived her presence at the crime scene viewing by the jury and has not identified any prejudice arising from this claim that contributed to or resulted in her conviction. For this reason, she has not shown that the *Martinez* prejudice prong is met or that the claim is meritorious—neither trial counsel nor post-conviction was ineffective.

**MEMORANDUM DECISION AND ORDER - 75**

### 7.  Claim Four: Conflict of Interest

Sarah asserts that she was denied her Sixth and Fourteenth Amendment rights to effective assistance of counsel under *United States v. Cronic*, 466 U.S. 648 (1984), when her appointed counsel labored through the proceedings under an actual conflict of interest. In particular, she asserts that her trial counsel had a dispute with the county over the amount he was to be paid for his attorney services under their contract.

This claim is procedurally defaulted, because Sarah withdrew it in the course of her successive post-conviction proceeding. State's Lodging G-1, p. 209. To meet the *Martinez* exception, Sarah must show that the claim is substantial and that she was prejudiced.

The Sixth Amendment includes the right to be represented by conflict-free counsel. *Woods v. Georgia*, 450 U.S. 261, 271 (1981). To establish a violation of that right, a habeas petitioner must show than an actual conflict of interest adversely affected his lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 338 (1980). An actual conflict of interest is one "that affected counsel's performance – as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 170 (2002). In *Mickens*, the Court further refined the *Sullivan* rule and opined that courts should not apply *Sullivan*'s presumed prejudice rule "unblinkingly to all kinds of alleged attorney ethical conflicts," "even" alleged conflicts involving counsel's "personal or financial interests." *Id.* at 174 (internal quotation marks and citations omitted). In *Mickens*, the Court emphasized that *Sullivan* required a defendant to show that "counsel actively

**MEMORANDUM DECISION AND ORDER - 76**

represented conflicting interests," rather than simply show the existence of conflicts between a client's welfare and counsel's financial interests. *Id*. at 175–76.

Sarah asserts that an actual conflict of interest existed, because Mr. Pangburn had an ongoing dispute over billing and payment with Blaine County, with whom Mr. Pangburn contracted to provide representation to indigent criminal defendants, including Sarah. State's Lodging G-1, pp. 28-33; Dkt. 8-1, pp. 19-22. Sarah has asserted, among other things, that: (1) Mr. Pangburn alerted the court, prior to the trial, that the county contract conflicted with the Rules of Professional Conduct in requiring him to provide reports to the court and county prosecutor to support his application for payment of additional fees; (2) Mr. Pangburn sent "detailed reports [to the county] explaining what was done during each billed hour"; (3) after the trial, the trial court revoked the appointment of Mr. Pangburn's co-counsel and all defense investigators for the remainder of the post-trial proceedings; (4) there existed a long-running dispute between Mr. Pangburn and the county regarding Mr. Pangburn's compensation rate; and (5) the court ultimately ordered Mr. Pangburn to return to Blaine County any sums over $65.00 per hour that it had paid to him. State's lodging G-1, pp. 28-33; Dkt. 8-1, pp. 19-22.

The record reflects that Mr. Pangburn's billing dispute with Blaine County was ongoing during his representation of Sarah. Mr. Pangburn first began representing Sarah on October 30, 2003. State's Lodging A-2, p. 53. Judge Wood reviewed the dispute in the context of representation for Sarah on November 25, 2003. Public Defender Douglas Nelson indicated he anticipated that he may be called as a witness at Sarah's trial, and

therefore had an actual conflict of interest. State's Lodging A-1, p. 6. The court noted that the considerations of the alleged conflict of interest regarding review of Pangburn's billings were "budgetary only." *Id*. Mr. Pangburn diligently and successfully pursued a request for appointment of a second chair counsel, as the case was classified as a "complex, forensic case" that required more than one defense attorney. *Id*. Mr. Pangburn engaged in discovery, pursued motions to compel and for sanctions, filed a motion to suppress, filed motions to exclude evidence, filed motions on pretrial publicity, hired experts and investigators, filed motions regarding Sarah's pretrial detainee housing, and otherwise vigorously pursued Sarah's defense. *See* State's Lodgings A-1 to A-21.

Despite the ongoing dispute between Mr. Pangburn and the county, which paid Sarah's legal fees, this Court does not see any connection between the subject matter of the conflict of interest and the work counsel performed for Sarah. In *Sanders v. Ratelle*, 21 F.3d 1446, 1452 (9th Cir. 1994), the Ninth Circuit explained: "The existence of an actual conflict cannot be governed solely by the perceptions of the attorney; rather, the court itself must examine the record to discern whether the attorney's behavior seems to have been influenced by the suggested conflict."

Sarah has not shown that Mr. Pangburn neglected her case or neglected her as a client due to the dispute over his contract with the county. Rather, the record reflects that much of the dispute was over the fact that Mr. Pangburn did *more* work for Sarah than he was authorized to do on the case. He "billed over 1000 hours of attorney time for January and February," and billed for "advice to Sarah in the PSI process that the court did not

MEMORANDUM DECISION AND ORDER - 78

feel was warranted, including advice and assistance in filling out the PSI questionnaire." Dkt. 8-1, p. 21.

Sarah has not alleged with any particularity, and this Court sees nothing in its own review of the record to show, that Mr. Pangburn's representation of Sarah was negatively influenced by his dispute with the county over his contract. The conflict did not rise to the level of an actual conflict under *Cronic* or *Mullaney*. This claim fails for lack of *Martinez* prejudice and lack of merit.

## 8. Claim Five: Ineffective Assistance of Direct Appeal Counsel

Sarah asserts that her direct appeal counsel was ineffective under the Sixth Amendment on two factual bases: (A) failure to raise district court error in denying the motion to suppress the testimony of Malinda Gonzalez; and (B) failure to raise an argument that the two fixed life sentences were both excessive and unconstitutional. The *Martinez* exception does not apply to direct appeal counsel claims. *See Davila v. Davis*, 582 U.S. 521 (2017) (holding that *Martinez* is not applicable to claims of ineffective assistance of direct appeal counsel). Therefore, Plaintiff must show traditional cause and prejudice.

To show "cause" for a procedural default, a petitioner must prove that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). A defense attorney's errors that rise to the level of a violation of the Sixth Amendment right to effective assistance of counsel may, under certain circumstances, serve as a cause

to excuse the procedural default of other claims. *Murray v. Carrier*, 477 U.S. at 488.

However, an allegation of ineffective assistance of counsel will serve as cause to excuse

the default of other claims *only* if the ineffective assistance of counsel claim itself is not

procedurally defaulted or, if defaulted, a petitioner can show cause and prejudice for the

default. *Edwards v. Carpenter*, 529 U.S. 446, 454 (2000). In other words, before a federal

court can consider ineffective assistance of counsel as cause to excuse the default of

underlying habeas claims, a petitioner generally must have presented the ineffective

assistance of counsel claim in a procedurally proper manner to the state courts, such as in

a post-conviction relief petition, including through the level of the Idaho Supreme Court.

Sarah has not shown adequate cause for the default of these claims; therefore, they

are subject to dismissal with prejudice. Alternatively, as the Court will explain, they are

without merit and are subject to denial.

### A. *Malinda Gonzalez Testimony*

The *Strickland* principles apply to determining ineffective assistance of appellate

counsel claims. *Evitts v. Lucey*, 469 U.S. 387 (1985). To show prejudice on appeal, a

petitioner must show that their attorney failed to raise an issue obvious from the trial

record that probably would have resulted in reversal. *See Miller v. Keeney*, 882 F.2d

1428, 1434 n.9 (9th Cir. 1989). If a petitioner does not show that an attorney's act or

omission would have resulted in reversal, then they cannot satisfy either prong of

*Strickland*: appellate counsel was not ineffective for failing to raise such an issue, and

petitioner suffered no prejudice as a result of it not having been raised. *Id.*

**MEMORANDUM DECISION AND ORDER - 80**

"Effective legal assistance" does not mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). "[N]othing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable claim' suggested by a client." *Id.* at 754. "[T]he process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Burger v. Kemp*, 483 U.S. 776, 784 (1987) (internal citations and punctuation omitted).

Sarah asserts that appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in denying her motion to suppress the testimony of state witness Malinda Gonzalez, who was 22 years old. Dkt. 8-1, pp. 23-24; State's Lodging A-18, p. 3860. Gonzalez was Sarah's jail cellmate, who came forward to assert that Sarah made incriminating statements to her. *See* State's Lodging A-18, pp. 3857-4018. Prior to trial, Mr. Pangburn moved to suppress the statements, arguing that, under state law, it was unlawful to incarcerate a juvenile with adult inmates. *See id.*, pp. 450- 451; State's Lodging A-3, pp. 369-370. Sarah had been housed in the same cell as adult female inmates, because Blaine County had only one jail cell available for female inmates. *See id.*, p. 451.

After a hearing, Judge Wood denied the motion to suppress. State's Lodging A-4, pp. 448-456. The court concluded that Sarah's placement with adult inmates was

**MEMORANDUM DECISION AND ORDER - 81**

improper pursuant to I.C. § 20-602(2). *Id*., p. 453. However, the court concluded that this improper placement did not require the suppression of Sarah's statements to Gonzalez. *Id*., pp. 453-456.

Judge Wood found no controlling Idaho authority on the issue, but relied upon *State v. Kemper*, 535 S.W. 2d 241 (Mo. Ct. App. 1975), in which the Missouri Court of Appeals affirmed the trial court's refusal to suppress a juvenile's statements made to an adult inmate while the juvenile was improperly incarcerated in an adult facility. Judge Wood agreed that, when the purpose of a statute is to inhibit adult communication to juveniles, it need not be applied in a suppression case where the juvenile voluntarily communicated with an adult, because that situation was irrelevant to the essential intent of the statute. Further, the protections of *Miranda v. Arizona* do not apply to volunteered statements of a defendant to a fellow inmate. State's Lodging A-4, pp. 60-61 (citing *Kemper*, 535 S.W. at 256).

Therefore, rather than suppress the evidence, Judge Wood ruled the appropriate remedy was an order directing the sheriff to comply with I.C. § 20-602(2) and house Johnson separately from adults, even if such a placement required Johnson to be housed in another county. State's Lodging A-4, p. 455.

Here, Respondent argues that Sarah has not identified any controlling or relevant contrary persuasive authority involving juvenile inmate jail placement that would have dictated a different outcome in 2008, had counsel included it in the direct appeal. *See* Dkt. 8-1, pp. 23-24; State's Lodging G-1, pp. 129-132, C-7. The Court agrees that Sarah

**MEMORANDUM DECISION AND ORDER - 82**

has failed to establish a clear basis for an Idaho appellate court to reverse the trial court's denial of her motion to suppress, much less demonstrate that appellate counsel's decision not to raise this claim on direct appeal was so egregious as to overcome the presumption that direct appeal counsel's claim-selection determinations were anything but strategic.

Even if the state court erred in admitting Gonzales's testimony at trial and the issue would have been raised on appeal, it is unlikely that it would have been deemed harmful error. Sarah did not directly admit to Gonzales that she killed her parents. Gonzales testified that Sarah mentioned that: (1) the sheriff's investigator did not say anything on the news about the knives that were placed at the foot of each bed, *id*. at 3913-15; (2) that the pink bathrobe was placed in the trash dumpster on trash day, but the investigator got there before the trash truck and retrieved the robe, *id*., p. 3916; and (3) that Sarah would have more money than God when she got out of jail. *Id*., p. 3917-1. Gonzales' most harmful testimony was (1) that Sarah once "slipped up" and said, "When I kill – I mean when the killers killed my parents," *id*., p. 3863-64; (2) that Sarah said her mother was "a fucking bitch"; and (3) that Sarah had "knock-down, drag-out fights with her mom." *Id*., p. 3865.

The prosecutor briefly referenced Gonzales' testimony during closing argument to assert that it was Sarah, and not someone else, who had had staged the knives at the scene of the crime. State's Lodging A-11, pp. 213-214. Because of the extensive evidence pointing to Sarah as the perpetrator, the Court finds the absence of Gonzalez' testimony would not have made a difference in the outcome of the trial. Therefore, Sarah has not

**MEMORANDUM DECISION AND ORDER - 83**

demonstrated *Strickland* prejudice from any alleged deficient performance. Therefore, even if it was not procedurally defaulted, Claim 5(a) fails under de novo review.

### B. *Excessive or Unconstitutional Sentence*

Sarah asserts that her direct appeal counsel was ineffective for failing to challenge her sentences on the grounds that they were unconstitutional or excessive. Had direct appeal counsel raised an Eighth Amendment sentencing claim, counsel would not have had the benefit of either *Miller* or *Montgomery* to support the claim. In that era of law, there is nothing to show that Sarah's sentence was unconstitutional under *Roper* or *Graham*. Further, Because Sarah was able to and did challenge the constitutionality of her sentences after *Montgomery* made *Miller* retroactive, she cannot show that her direct appellate counsel was ineffective for failing to raise an earlier Eighth Amendment challenge that was even less likely to succeed.

There is no claim that the Idaho Constitution offers Sarah greater protection than the United States Constitution. Therefore, this claim fails under the reasoning above.

Neither would an excessive sentence under an abuse of discretion theory have been successful. To show that her sentence was excessive under Idaho law, Sarah would have had to bring forward evidence that the state district court abused its discretion. *Idaho v. Oliver*, 170 P.3d 387, 391 (Idaho 2007) (citing *Idaho v. Strand*, 50 P.3d 472, 475 (Idaho 2002); *Idaho v. Huffman*, 159 P.3d 838 (Idaho 2007)). Where a sentence is within statutory limits, the appellant bears the burden of demonstrating a clear abuse of discretion. *Idaho v. Baker*, 38 P.3d 614, 615 (Idaho 2001) (citing *Idaho v. Lundquist*, 11

**MEMORANDUM DECISION AND ORDER - 84**

P.3d 27 (Idaho 2000)). The abuse of discretion test analyzes whether the district court:
"(1) correctly perceived the issue as one of discretion; (2) acted within the outer
boundaries of its discretion; (3) acted consistently with the legal standards applicable to
the specific choices available to it; and (4) reached its decision by the exercise of reason."
*Lunenberg v. My Fun Life*, 421 P.3d 187, 194 (Idaho 2018).

Based on the sentencing court's extensive analysis of the reasons for the LWOP
sentence, this Court concludes there is no likelihood that an Idaho appellate court would
have vacated Sarah's sentences on the ground that the trial court abused its sentencing
discretion. Therefore, Sarah cannot demonstrate *Strickland* deficient performance or
prejudice as to direct appeal counsel's failure to raise a sentencing claim under the Eighth
Amendment, the Idaho Constitution, or a state law abuse-of-discretion theory. Therefore,
even if it was not procedurally defaulted, this claim fails under a de novo review.

### 9.  Summary

Claims Two and Seven fail on the merits. Claims Three, Four, and Five are
procedurally defaulted. No adequate cause and prejudice has been shown to excuse the
default of these claims. Alternatively, they fail on the merits. To the extent that the Court
has not explicitly addressed all of Sarah's particular arguments as to any claim, the Court
clarifies that it has considered and rejected them.

**ORDER**

**IT IS ORDERED:**

1.   The Amended Petition for Writ of Habeas Corpus (Dkt. 8) is DENIED and DISMISSED with prejudice.

2.   The Court will issue a certificate of appealability for Claim Seven. As to the other claims, the Court does not find their resolution to be reasonably debatable, and. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability for other claims from the Ninth Circuit by filing a request in that court.

DATED: August 2, 2023

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 87**